GENERAL OVERSEAS CORPORATION v.
REPUBLIC PICTURES INTERNA-
TIONAL CORPORATION.

District Court, S. D. New York.
Nov. 19, 1947.

Phillips, Nizer, Benjamin & Krim, of New York City (Walter S. Beck and Leon Alexandroff, both of New York City, of counsel), for plaintiff.

Meyer H. Lavenstein, of New York City (John F. Caskey and Bertram H. Lebeis, both of New York City, of counsel), for defendant.

RIFKIND, District Judge.

This is an action by General Overseas Corporation against Republic Pictures International Corporation for breach of an oral contract whereby plaintiff was licensed to distribute some of defendant's motion pictures. The action, commenced in the New York Supreme Court, was removed to this Court on diversity grounds and has been tried without a jury.

Robert Haggiag, president of the plaintiff, had begun his business dealings with defendant in 1941, and by February, 1945, had successfully completed several contracts with the defendant. Among these was one for the distribution of certain motion pictures in French North Africa. Generally, the negotiations had been conducted between Haggiag and Morris Goodman, who was president and general foreign sales manager of defendant until July of 1945.

The plaintiff's version of the transaction in dispute is as follows:

Haggiag wished to arrange a deal for the distribution in France, Belgium and Luxembourg of certain motion pictures he already had under contract for North Africa. Part of the motivation was Haggiag's desire to make further use of films whose superimposed French tities he had paid for in connection with the North African deal.

Some days prior to February 21, 1945, Haggiag approached Goodman. After some negotiations, an agreement was reached on February 21, 1945. The main terms of this agreement provided that plaintiff was to have the exclusive right, for a period of five years, to distribute, exhibit and sub-license others to distribute and exhibit in the territories of France, Belgium, Luxembourg, and the city of Djibouti, thirty-two specified copyrighted motion pictures theretofore released by Republic Pictures Corporation (of which the defendant is a wholly-owned subsidiary). Some of the pictures were to be distributed also in the islands of Martinique and Guadeloupe.

The plaintiff agreed to pay for this license the sum of $70,000, payment to be made by depositing within 60 days, 3,500,000 francs in an account to be opened in defendant's name in the Paris branch of an American bank.

No mention was made at this meeting of indemnity in the event of the devaluation of the franc, nor of a personal guarantee by Haggiag. A memorandum, dated February 23, 1945, prepared and initialed by Goodman, and sent to defendant's legal department for preparation of a formal contract, accurately reflected the entire agreement, except that the license period was inaccurately stated to be four years instead of five. A few days after the main agreement was reached, Goodman called Haggiag to his office. At this meeting Goodman said that since the French Government forbade conversion of francs to dollars and remittance of the dollars to the United States, he thought he should be protected against a possible devaluation of the franc before conversion was permitted. Haggiag, because he thought the request reasonable, and because he wished to continue the profitable business association, agreed to grant Goodman a partial indemnity. After some bickering it was agreed that in case the value of the franc dropped, plaintiff, and Haggiag personally, were to indemnify defendant for the difference between the value of 3,500,000 francs and $70,000 in francs, and in no case was this indemnity to exceed 1,750,000 francs. It was also agreed that Haggiag was to guarantee payment.

After this meeting, Haggiag did not see Goodman until July, 1945, when Goodman had already left defendant's employ.

Haggiag left New York City about March 9, 1945. It was not until early April, upon

his return, that he saw mail that had arrived on March 9th, the day of his departure—four copies of a contract, dated February 23, which had been prepared from Goodman's memorandum of the agreement, and four copies of a separate contract, dated February 26, which purported to embody the franc fluctuation agreement, accompanied by a transmittal letter dated March 8. In accordance with Haggiag's practice, he signed the contracts, nearly all the copies, without reading them. Haggiag then glanced at the contract dated February 23, noted that the term was incorrectly stated to be four years, put the papers down without reading them further, and telephoned defendant's office, notifying one of the officials of the error. He did not consult the papers again until after the error was rectified.

Defendant sent plaintiff four signed copies of an amendment dated April 5, 1945, changing the term from four to five years, along with a transmittal letter dated April 16, 1945. The first paragraph of the transmittal letter reads:

"Referring to contract of February 23, 1945, we attach hereto four copies of amendment dated April 5, 1945 changing the license period from four years to five years from date of contract."

The first paragraph of the enclosed April 5 amendment reads:

"Your signature under the words 'Agreed To' below will constitute the following an agreement between us amending that certain agreement between us dated February 23, 1945, as amended by letter agreement dated February 26, 1945, as follows:"

Haggiag signed the April 5 amendment shortly after its receipt, then finally read the February 23rd and February 26th contracts. After perusal he discovered that the February 26th contract which granted the defendant the option of requiring, as an indemnity against franc fluctuation, payment up to 1,750,000 francs in France or $35,000 in New York, did not accord with his understanding of the indemnity agreement, and that the personal guarantee of payment in the February 23rd agreement seemed broader than the agreement itself. Accordingly he tore off his signatures on some copies, obliterated it on others, of the

February 26th agreement and the February 23rd guarantee.

On May 1, 1945, Edward L. Becker, Goodman's assistant, wrote the following letter to Haggiag:

"Re: France and Belgium

"Dear Mr. Haggiag:

"We are waiting for the return of the signed contract and amendment granting distribution rights in the above territory.

"You recently advised us the signed agreement was being sent through but up to this time we have not received it."

This was followed by several telephone calls between Becker and Haggiag in which Haggiag informed defendant of his views on the fluctuation agreement. On May 15 the following letter was sent by Becker to Haggiag:

"Re: France and Belgium

"Dear Mr. Haggiag:

"Referring to contract of February 23rd and amendment of February 26th, which you state you are unable to sign because the amendment is not in accordance with your understanding or agreement, please note that I have put this up to Mr. Goodman who cables me that the memorandum to our legal department on which the amendment is based was the result of his conversation and understanding with you, and that you agreed to the stipulation contained therein.

"Mr. Goodman requests that you sign the contract and amendment as they are both in accordance with understanding arrived at between him and you.

"Please let us hear from you on this promptly."

There were more telephone calls, and on May 24th a letter was sent from plaintiff to defendant containing, in part, the following:

"With reference to your signed copies of the agreement sent us, we ask you to note that the guarantee contained therein does not conform to our agreement and definite understanding. The sole purpose of the guarantee was to assure you, in the event of a fluctuating currency, that you should be paid an additional amount up to 1,750,000 French francs, and it was agreed that Mr. Robert Haggiag would personally guarantee

payment of such additional sum, *in French francs*. Mr. Haggiag is, and at all times, has been willing to sign such a guarantee when it is presented to him.

"As far as your letter of February 26th, 1945 is concerned, we shall again repeat that the sole purpose of the additional amendment was to protect you, in the event of fluctuation, to the extent of 1,750,000 French francs. At no time did we discuss any payment of dollars, and it was at all times understood that payment, in the event of fluctuation, would be made in French francs, in France, and limited to the outside sum of 1,750,000 francs.

"We hope that you will see the fairness and justice of our position, since the same is exactly as was agreed upon in our preliminary negotiations. We are ready to proceed with the contract as agreed and will sign any papers which conform to our agreement."

On June 1, 1945, the defendant sent the plaintiff a letter terminating all negotiations, naming as one of the reasons plaintiff's refusal to recognize and sign the contract and its amendments.

From April 9th, when an agent of Haggiag sent a check for 3,500,000 francs to the Paris branch of the Chase Bank, until June 1 when defendant cancelled its authorization to accept the deposit, negotiations for the deposit had been progressing, and, if not for the cancellation, in the opinion of Haggiag, would have culminated successfully.

Plaintiff founds his action on the oral contract. For compliance with the Statute of Frauds it relies on defendant's inter-office memorandum dated February 23, and the letter of transmittal, dated April 16. These writings contain no reference to currency-fluctuation.

Assuming the truth of plaintiff's version, as stated, plaintiff cannot recover.

■■ In reaching this conclusion I do not rely on the failure of the parties to sign a formal contract. Previous agreements between the parties were eventually reduced to formal writings, and it was intended that the agreement here in dispute would achieve such permanent form. But the history of their past transactions and the evidence concerning the instant agreement clearly support a finding that the parties considered themselves bound by the oral agreement, such as it was, at the time it was reached. Under such circumstances, subsequent failure to carry out their intention to reduce their agreement to writing and to sign it, does not affect the enforceability of the oral contract. Unless it is the clear intention of the parties not to be bound until a formal contract is signed, failure to sign is not destructive of an agreement already reached. Sherry v. Proal, 1912, 206 N.Y. 726, 100 N.E. 421; Sanders v. Pottlitzer Bros. Fruit Co., 1894, 144 N.Y. 209, 39 N.E. 75, 29 L.R.A. 431, 43 Am.StRep. 757; Disken v. Herter, 1902, 73 App.Div. 453, 77 N.Y.S. 300, affirmed, 1903, 175 N.Y. 480, 67 N.E. 1081.

■ The contract sued upon is an oral one, and is incapable of performance within a year. It must, therefore, comply with the terms of Sect. 31 of the New York Personal Property Law, Consol. Laws, c. 41, which provides in part:

"Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking;

"1. By its terms is not to be performed within one year from the making thereof * * *."

■ So much plaintiff does not dispute. The form of the writing relied upon by plaintiff—an inter-office memorandum and a transmittal letter—presents no difficulty. A memorandum sufficient for the purposes of the Statute of Frauds may consist of various writings, for which little formality is required. It "may be contained in a bill or note, a bill rendered, * * * a check, * * * a letter * * *." 37 Corpus Juris Secundum, Frauds, Statute of, § 176. The writing may be from the promisor to his own agent. Marks v. Cowdin, 1919, 226 N.Y. 138, 123 N.E. 139. The writings relied upon by plaintiff are not, therefore, technically objectionable. Ward v. Hasbrouck, 1899, 44 App.Div. 32, 60 N.Y.S. 391.

■ The memorandum must, however, contain *all* the essential terms of the agreement. Standard Oil Co. v. Koch, 1932, 260 N.Y. 150, 183 N.E. 278; Donald Friedman & Co. v. Newman, 1931, 255 N.Y. 340, 174 N.E. 703, 73 A.L.R. 95; Poel v. Brunswick-Balke-Collender Co., 1915, 216 N.Y. 310, 110 N.E. 619. It becomes crucial, therefore, to examine the provision against fluctuation in order to determine whether it and the agreement relied upon by plaintiff are generically inseparable. If the former is an essential term of the agreement, the memorandum is insufficient.

■ Authority is legion that the price term of an oral agreement is one of the essential terms, which must be evidenced in the memorandum. Ansorge v. Kane, 1927, 244 N.Y. 395, 155 N.E. 683; 2 Williston, Contracts, Rev.Ed.1936, § 574. Plaintiff has advanced no plausible argument to support the contention that the price term of a motion picture license agreement is not an essential term of that agreement. The essence of its position, and it must be met squarely, is that the agreement to indemnify against franc devaluation does not affect the price provision—that it is an independent contract.

■ It does not seem to me that the temporal relationship between entering into two agreements is determinative of their interdependence, or even very helpful. Two independent contracts can be made at the same sitting and even in the same writing; a modification of one contract can be effected years after the main agreement is reached. Whether or not the fluctuation agreement is part of the price term (or a modification of it) does not depend upon when it was made. The fact, therefore, that the plaintiff claims that the agreements were reached at two sittings, is not controlling.

Whatever a legalistic analysis may lead to, common sense says that when Mr. Goodman talked over the fluctuation of the franc with Mr. Haggiag, and finally reached an agreement, they understood that the consideration defendant was to receive under the contract was being modified; thereby they changed the price. That is all there is to plaintiff's case. They were not branching out into the foreign currency field. This was no wager on franc futures where one was to prosper if the franc fell, the other if it climbed. Here were two astute businessmen, whose business was motion-pictures. They were parrying for advantage in the terms of a contract. Neither thought that the fluctuation negotiations were going to result in a little independent contract, insulated from contact with the deal they were concluding. The business fact is that the indemnity agreement was rooted in the license agreement. I see no persuasive reason why the law should treat it as severed from its roots.

■ In considering the situations in which parol evidence is admissible to vary the terms of a written contract the Court of Appeals in the leading case of Mitchill v. Lath, 1928, 247 N.Y. 377, 380, 381, 160 N.E. 646, 647, 68 A.L.R. 239, laid down three rules which, in my opinion, aptly describe the conditions an agreement should fulfill before being entitled to the appellations "independent" and "severable" in a Statute of Frauds case:

"Under our decisions before such an oral agreement as the present is received to vary the written contract, at least three conditions must exist; (1) The agreement must in form be a collateral one; (2) it must not contradict express or implied provisions of the written contract; (3) it must be one that parties would not ordinarily be expected to embody in the writing, * * *. Or, again, it must not be so clearly connected with the principal transaction as to be part and parcel of it."

The analogy is a sound one. The quest in both the written contract-parol evidence and oral contract-Statute of Frauds situations is for a standard of independence, a standard which is not met by the fluctuation agreement.

■ Since there must be a written memorandum of all essential terms of a contract by its terms incapable of performance within a year, and since plaintiff is suing upon an oral contract evidenced by a memorandum containing an incomplete account of the price arrangement, judgment must go for defendant. No case cited by either party conflicts with this conclusion except, per-

haps, the case of Howell v. Garrett, 1926, 218 App.Div. 322, 218 N.Y.S. 301, heavily relied upon by plaintiff.

That case involved an action for damages for the buyer's breach, it seems, of a written contract for the sale of sugar. The clause in dispute read:

"At Twenty-one and 30/100 (21.30¢) Cents per pound, less 2%, duty paid, F.O.B. New York City, net landed weights.

"Should various estimated charges used in arriving at the above price prove less than expected, credit voucher for the difference will be rendered the buyer."

The controversy raged over the second paragraph. The defendant claimed throughout that, the price term in the writing being indefinite, there was never a contract. The trial court, with the subsequent approval of the Appellate Division, regarded the contract as a written one, excluded parol evidence as to its terms and went on to add, by way of dictum, that if an essential term of a written contract is missing or indefinite, it is void as violative of the Statute of Frauds. It is difficult to understand the relevance of the Statute in a case concerned with a written contract. In any event the court was faced with the contract as drawn. The price was stated and there was no dispute as to the basis for making the calculation for the credit voucher, nor its amount. The defendant sought to avoid its contract because of the language of the provision for the credit adjustment. The court, understandably, was seeking to avoid the harsh effects of a decision for the defendant, and held that the second paragraph constituted a separate agreement.

No cases are cited to support the court's reasoning, nor has the case itself ever been cited for the proposition for which it is offered as authority. Williston, in expounding the rule of law that a contract, one portion of which is unenforceable under the Statute of Frauds, is unenforceable in any part, cites Howell v. Garrett in a footnote: "But sometimes the courts avoid this result by interpreting the transaction as two separate agreements * * * Howell v. Garrett * * *." 2 Williston, Contracts, Rev.Ed.1936, § 532 n.l.

It is certain that Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, does not require this court to follow the route marked by Howell v. Garrett. In final analysis the case can be said to hold no more than that, as a matter of fact, the parties in that case had made two separate agreements. True enough, the court called it a question of law; but that must be read in the sense that it is that kind of question of fact which is decided by the court and not by the jury. But even if it be argued that it represents a true rule of law in the sense of Erie R. Co. v. Tompkins, then the rule is limited to the proposition that the words used in the Howell agreement spell out two separate contracts. We have no such words in the case at bar. It would be manifestly absurd to suggest that the case stands for the rule that every paragraph of a written agreement is to be read as a separate and severable contract.

On plaintiff's statement of the case, therefore, judgment would go for defendant.

In any event, I cannot find that Haggiag's testimony regarding the transaction is in all respects credible.

Goodman testified that the entire agreement, including the fluctuation provision and Haggiag's personal guarantee, was reached at one sitting, but that at Haggiag's request the fluctuation provision was put in a separate document. Goodman's explanation is that Haggiag wanted the fluctuation agreement to be placed in a separate document because the French authorities, whose approval was necessary in order to open a bank account in a foreigner's name, and which required that a copy of the contractual basis for the financial transaction be shown them, would look with disfavor upon a contract whose terms reflected lack of faith in the stability of the franc. The plan was not to show the fluctuation agreement to the French. Goodman testified that he acceded to Haggiag's request, and, in order to make reference to the second document less cumbersome, arbitrarily assigned it a different date. He said that he dictated one memorandum immediately after the other, and sent them to the legal department together.

The emphasis placed upon the words "separate letter" in the first paragraph of the inter-office memorandum dated February 26th bears out Goodman's recollection:

"With reference to my memo of February 23, 1945 outlining a deal with Robert Haggiag, doing business as General Overseas Corporation, 363 Lexington Avenue, New York City, on a block of product for France, Belgium, Luxembourg, Martinique, Guadeloupe and the city of Djibouti, please prepare a *separate letter* amending such agreement to provide the following:"

There is another reason why I have concluded that the fluctuation agreement was contemporaneous with the main one.

In February of 1945, the French franc had an official value of 50 francs to the dollar. "Unofficially" a great many more than 50 francs could at that time have been purchased for an American dollar. In February, 1945, conversion of francs to dollars and remittance of the dollars to the United States were forbidden by the French government. Goodman and Haggiag were both as conversant with the foreign exchange situation as a reasonable man would expect people in their business positions to be. It is unlikely in the extreme that Goodman should have negotiated a French contract in February of 1945 without discussing franc fluctuations.

The testimony of Goodman's secretary that the two memoranda were dictated by Goodman on different days was contradicted by Becker and Goodman. Her credibility was further impeached by the witness Lavenstein, and her abiding antipathy to defendant was demonstrated.

I am convinced also that the terms of the indemnity agreement were as Goodman testified and as the memorandum and proposed contract stated them to be. It was undisputed that Goodman's business methods were orderly and precise. Memoranda of his dealings were made promptly after the close of conversations. It is unlikely that the discrepancy between the memorandum and Haggiag's understanding of the agreement was due to Goodman's inaccurate reporting. It is even more unlikely that Goodman should have made one agreement and immediately tried to trick Haggiag into signing another.

In the exchange of cables between Becker and Goodman, then in Europe, the latter insisted upon his version of the agreement. I am especially impressed with the following excerpt from a cable, dated May 13, 1945, from Goodman to Republic:

"Re Haggiag attached to my memo to McMahon you may find pencilled memorandum our conversation to that effect however whatever is in my memo to McMahon was discussed with and agreed to by him stop Insist he sign contract as prepared stop Advise telegraphically whether this being done"

Nor am I persuaded of the accuracy of Haggiag's testimony as to his handling of the contracts—the prolonged neglect to read a comparatively brief contract, the discovery of an error which prompted failure to continue to read, rather than more careful perusal, the signing before reading, the inability to remember whether the copies sent to his French associate were signed. All this suggests an ineptitude not borne out by Haggiag's prior dealings.

Either Haggiag hoped to get more attractive terms by delay (since he couldn't do worse than the terms of the proposed contract) or there was a complete misunderstanding, in which case there never was a contract. I believe the former to be true.

In his attempts to wheedle a better contract Haggiag repudiated the one he had.

The fact that the defendant continued to pursue its application for permission to have a bank account opened in its name in Paris is not prejudicial. At no time did it acquiesce in plaintiff's construction of the contract, and the cancellation of its authority to accept the deposit was effected in a reasonable time after receipt of plaintiff's definitive letter of May 24.

Judgment for defendant.