Harry YONOFSKY, Plaintiff,

v.

Sol WERNICK, Defendant.

No. 64 Civ. 417.

United States District Court,
S. D. New York.

July 26, 1973.

Friedman & Fischman, New York City (William D. Friedman, New York City, of counsel), for plaintiff.

Stull & Stull, New York City (Richard J. Stull, New York City, of counsel), for defendant.

## OPINION

EDELSTEIN, Chief Judge:

### I. INTRODUCTION

Plaintiff [1] commenced this action on February 6, 1964 by filing a complaint charging defendant with wrongfully excluding him from a joint venture or partnership. Plaintiff contends that he and defendant entered into an oral agreement in April, 1963 to acquire and thereafter operate as a joint venture the assets of the Potentiometer [2] Division of the DeJur-Amsco Corporation [3] [hereinafter referred to as DeJur]. The complaint further alleges that the parties agreed that if plaintiff would use his "peculiar, unique and close relationship with DeJur Amsco Corporation and its officers and directors to initiate, influence, arrange and facilitate the said acquisition, defendant would supply the entire cash consideration." Additionally, plaintiff asserts that the parties agreed to operate their joint venture through a corporation to be formed in Connecticut, and that they agreed that the Corporation would be called Samarius, Inc.[4]

Plaintiff alleges that defendant, after long and protracted negotiations, eventually acquired the DeJur Potentiometer Division on or about September 30, 1963; that plaintiff was excluded from the acquisition; and that defendant thereby breached their joint venture agreement.[5]

The first cause of action seeks one-half of all sums received by defendant through his acquisition and operation of the DeJur Potentiometer Division. The second cause of action seeks recovery of one-half of the value of the Potentiometer Division or $25,000.00 at plaintiff's option, for services performed by plaintiff in initiating and arranging for defendant's acquisition.

Upon agreement of the parties an order was entered pursuant to Fed.R.Civ. P. 42(b) providing for a separate trial on the issue of liability. At the same time all discovery sought by plaintiff with respect to the operations of Samarius, Inc., which was aimed at eliciting damages, was held in abeyance pending determination of the liability issue. Thereafter, on plaintiff's motion this action was assigned to the commercial non-jury calendar for purposes of trial on the issue of liability.

After much delay, trial was commenced on April 15, 1970 and was concluded on the following day. Decision was reserved. The parties were instructed to prepare post-trial memoranda and to submit proposed findings of fact and conclusions of law. The court

---

1. Plaintiff died while this case was *sub judice*. *See* note 6 *infra* and accompanying text.

2. A potentiometer is simply a voltage divider. It is more specifically defined as "an instrument for the precise measurement of electromotive forces by which a part of the voltage to be measured is balanced against that of a known electromotive force and computed therefrom by the law of fall potential. . . ." Webster's Third New International Dictionary 1775 (1963).

3. The DeJur-Amsco Corporation is a publicly held corporation whose stock is traded on the American Stock Exchange.

4. Samarius is defendant's first name.

5. After his acquisition, defendant relocated the Potentiometer Division in Derby, Connecticut, and has operated it through Samarius, Inc., a Connecticut corporation organized in October, 1963.

was provided with these items by mid-summer 1970.

## II. MOTION FOR SUBSTITUTION

■ While this case was *sub judice*, defendant served a suggestion of death pursuant to Fed.R.Civ.P. 25(a)(1), indicating for the record that the plaintiff, Harry Yonofsky, died on October 25, 1970.[6] On February 25, 1971, Charles Winter, in his capacity as executor of plaintiff's estate, moved to be substituted as party plaintiff.[7] Since the time to move for substitution under Rule 25(a)(1) had expired, Winter also moved for an enlargement of time in which to make the motion. Fed.R.Civ.P. 6(b)(2). Defendant opposed the motion for substitution on the ground that it was untimely.

Rule 25(a)(1) provides as follows:

If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties. *The motion for substitution* may be made by any party or by the successors or representatives of the deceased party and, together with the notice of hearing, *shall be served on the parties as provided in Rule 5 and upon persons not parties in the manner provided in Rule 4 for the service of a summons,* and may be served in any judicial district. *Unless the motion for substitution is made not later than 90 days after the death is suggested upon the record by service of a statement of the fact of the death as provided herein for the service of the motion, the action shall be dismissed as to the deceased party.* [emphasis added].

In his papers opposing the motion for substitution, defendant states that, "The motion to substitute plaintiff's Executor

is dated 118 days following the serving and filing of the suggestion of plaintiff's death upon the record." From this he concludes that the motion is untimely and requests that the motion be denied and that the action be dismissed as provided for in Rule 25(a). In support of this position, defendant relies on Johns Hopkins University v. Hutton, 297 F.Supp. 1165 (D.Md.1968) and Graham v. Pennsylvania Railroad, 119 U.S.App. D.C. 335, 342 F.2d 914 (1964), cert. denied, 381 U.S. 904, 85 S.Ct. 1446, 14 L. Ed.2d 286 (1965).

In the *Johns Hopkins* case four of the original defendants had died after the commencement of the action. Suggestions of death were duly filed with respect to each of the deceased defendants. As to two of the defendants no motion for substitution was made by anyone connected with the litigation. The court dismissed the complaint with respect to those defendants. Regarding the other two deceased defendants, motions to substitute their executors were made and the executors concerned were duly served with the motions for substitution. There was no opposition to these motions. The court, therefore, entered an order substituting the executors for these deceased defendants.

In *Graham* the United States Court of Appeals for the District of Columbia Circuit, with one member of the panel dissenting, affirmed *per curiam* the dismissal of an action with respect to a deceased plaintiff by the district court. The lower court predicated its dismissal on the ground that plaintiff had failed to comply with Rule 25(a)(1) by not moving for substitution within the ninety-day period provided for after a suggestion of death is filed. On appeal the issue was whether the district judge had abused his discretion in refusing to ex-

---

6. Defendant's suggestion of death was incorrect regarding the date of plaintiff's death. The correct date is October 26, 1970.

7. The survival of a cause of action after a party's death is controlled by state law in a diversity case. *See, e. g.,* McManus

v. Lykes Bros. S. S. Co., 275 F.Supp. 361 (E.D.La.1967). Under New York law the instant action survives. N. Y. Est., Powers & Trust Law § 11–3.2(b) (McKinney's Consol.Laws, c. 17–b 1967). *Cf.* Owen v. Blumenthal, 167 Misc. 213, 3 N.Y.S.2d 192 (Sup.Ct.N.Y.County 1938).

tend the time in which a motion for substitution could be made. Plaintiff's attorney moved for an enlargement of time under Rule 6(b). Upon a showing of "excusable neglect," Rule 6(b)(2) permits a party to move for enlargement of a time period that has expired. In *Graham* plaintiff's attorney predicated his "excusable neglect" argument on two grounds: (1) that he was unfamiliar with the 1963 Amendment to Rule 25, which mandated the ninety-day period for filing a motion for substitution[8]; and (2) that he was engaged in the preparation of seven appellate proceedings and one extensive trial during the period after he filed the suggestion of death. After a hearing the district court refused to extend the time to move for substitution and dismissed the action with regard to the deceased plaintiff. In affirming the decision below, the Court of Appeals found that the trial judge had not abused his discretion.[9]

Responding to these contentions, plaintiff's executor asserts that the suggestion of death served by defendant was defective and that the application for enlargement under Rule 6(b)(2) is meritorious.

Plaintiff's executor contends that the suggestion of death served by defendant was defective for two reasons. First, because it was only served on plaintiff's attorney and secondly, because it failed to identify plaintiff's representative.[10] The two points are related. In relevant part Rule 25(a)(1) provides that a "motion for substitution may be made by any party . . . and, together with the notice of hearing, shall be served on the parties as provided in Rule 5 and upon persons not parties in the manner provided in Rule 4 for the service of a summons . . . ." Additionally, it provides for the service of the suggestion of death in the same manner as provided for with respect to the motion for substitution. Consequently, plaintiff's executor contends that defendant should have served the suggestion of death on someone beside plaintiff's former counsel.[11] The "someone," however, was not identified. In general, the executor or administrator of a deceased party's estate is the individual substituted and upon whom service is effected. In the case at bar, it was defendant who suggested the death of plaintiff. He did so only two days after the plaintiff died.[12]

8. The 1963 Amendment to Rule 25(a)(1) became effective on July 1, 1963. In *Graham* plaintiff's counsel filed a formal suggestion of death on July 24, 1963. Hence, the ninety-day period began to run against him only a few weeks after the effective date of the 1963 Amendment. *See* note 22 *infra*.

9. For a more complete analysis of these cases as they apply to the instant controversy see p. 1015 *infra*.

10. Form 30, contained in the Appendix of Forms to the Fed.R.Civ.P. provides as follows:
SUGGESTION OF DEATH UPON THE RECORD UNDER RULE 25(a)(1)
A. B. [describe as a party, or as *executor, administrator, or other representative or successor of C. D., the deceased party*] suggests upon the record, pursuant to Rule 25(a)(1), the death of C. D. [describe as party] during the pendency of this action. Added Jan. 21, 1963, eff. July 1, 1963. [emphasis added].

11. It should be noted that under New York law the death of a party to a law suit revokes the power of an attorney to represent the deceased party. Supplementary Practice Commentary to N.Y.Civ.Prac. Law (C.P.L.R.) § 1015 (McKinney's Consol.Laws, c. 8, Supp.1972), for 1965 and 1966 by Dean Joseph M. McLaughlin.

12. The plaintiff died on October 26, 1970, and defendant's suggestion of death is dated October 28, 1970. Defendant's intention was to limit plaintiff's time to move for substitution. As one court has stated:
Under the amended Rule either a party or "the successors or representatives of the deceased party" may avoid delay in effecting substitution for the deceased party either by filing a motion for substitution or by suggesting death on the record and thus triggering the 90-day period which begins with suggestion of death.
Rende v. Kay, 134 U.S.App.D.C. 403, 415 F.2d 983, 985 (1969).

Under these circumstances it would be difficult for defendant to know whom else to serve beside plaintiff's former counsel. With regard to the second point —i. e., that the suggestion of death was defective for failure to identify plaintiff's representative—the executor cites Rende v. Kay, 134 U.S.App.D.C. 403, 415 F.2d 983 (1969). In that case a suggestion of death was filed by the defendant's counsel indicating for the record that the defendant had died. The suggestion of death did not identify the deceased defendant's representative. Reversing the court below, the Court of Appeals held that the failure to name a successor or representative for the deceased defendant rendered the suggestion of death ineffective for purposes of triggering the ninety-day requirement. It should be noted, however, that in Rende, the attorney who filed the suggestion of death represented the deceased party, and, therefore, was in a position to know who would be the decedent's representative.[13] It is precisely for this reason that the court felt that defendant's counsel was under an obligation to name a successor for the deceased party.[14] Otherwise, the surviving party would be under the "burden of locating the representative of the [deceased party's] estate within 90 days." 415 F.2d at 986. In the case sub judice, it was the surviving party who suggested plaintiff's death. Therefore he would not be in the same position as was counsel for the deceased defendant in Rende. In general, he would not know who would be the representative or successor for the deceased party. Hence, by inverse analogy, the Rende case cuts against plaintiff's argument.

Having rejected movant's argument that the suggestion of death was defective, it is necessary to focus on the application for enlargement of time under Rule 6(b)(2). If the Rule 6(b)(2) motion is not granted, this action must be dismissed for failure to comply with the ninety-day limitation of Rule 25(a)(1). In relevant part Rule 6(b)(2) provides:

> When by these rules or by notice given thereunder . . . an act is required . . . to be done . . . within a specified time, the court for cause shown may at any time in its discretion . . . upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect . . . .

It should be noted that Rule 6(b) explicitly commits to the discretion of the court rulings on motions for enlargements.[15] Regarding how courts view their discretion under Rule 6(b), Professor Moore has observed:

> In accordance with the mandate of Rule 1, that the Rules should be construed "to secure the just, speedy and inexpensive determination of every action," the courts generally have given Rule 6(b) a liberal interpretation in order to work substantial justice.[16]

The burden is on movant to establish that the failure to act timely was "the result of excusable neglect." Professors Wright and Miller are of the view that the party moving for an extension must demonstrate good faith and must show "some reasonable basis for noncompliance within the time specified in the rules."[17]

---

13. It should be pointed out that even if the decedent's attorney knows who is named as executor, he may be required to wait until a probate court acts before moving for substitution. See Rende v. Kay, 134 U.S.App.D.C. 403, 415 F.2d 983, 986 (1969).

14. But see note 13 supra.

15. See Advisory Committee Note of 1963 to Rule 6(b). 2 J. Moore, Federal Practice

¶ 6.01[20] (2d ed. 1970) [hereinafter cited as J. Moore].

16. 2 J. Moore, ¶ 6.08 (footnote omitted).

17. 4 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1165, at 622 (1969). [hereinafter cited as C. Wright & A. Miller].

In his affidavit in support of Charles Winter's motion for substitution, plaintiff's attorney offers two reasons for his failure to act within the time limitation provided for in Rule 25(a)(1). The first reason is that there were numerous "time consuming problems proceeding [sic] the appointment of Mr. Winter as Executor. . . ." His second explanation concerns what he characterizes as a "diary oversight by deponent's firm."

With respect to the first point, counsel related a series of events following plaintiff's death which he contends are, at least in part, responsible for the delay. He asserts that he contacted Mrs. Yonofsky immediately after receiving defendant's suggestion of death, but was unable effectively to communicate with her because she was emotionally upset. But he did tell her it was necessary to bring estate proceedings so that a representative could be substituted for purposes of the instant case. A short time later he again called plaintiff's widow. At this time he was told that plaintiff had left no will and that there were no assets in plaintiff's estate. Believing that plaintiff had died intestate, counsel began preparing papers to secure Letters of Administration. After completion of these papers, but before they were filed, Mrs. Yonofsky "discovered the existence of some U. S. Treasury Bonds and three hundred and nine shares of DeJur-Amsco Corporation stock. . . ." This necessitated amending the previously completed papers. After these papers were redrawn and ready to be filed, Mrs. Yonofsky informed counsel that she had found a Last Will and Testament dated December 21, 1962, which named Charles Winter as Executor of plaintiff's estate. Needless to say, counsel abandoned the completed application for Letters of Administration, and began to prepare a petition and supporting papers for probate. The situation was further complicated when a second, earlier will was discovered. This, of course, required amendment of the prior probate papers. Finally, on February 5, 1971, Letters Testamentary were issued to Charles Winter, the Executor named in plaintiff's Last Will and Testament.

As to the "diary oversight" argument, counsel alleged that immediately after receiving the suggestion of death served by defendant, the ninety-day period, prescribed by Rule 25(a)(1) was calculated to terminate on "January 27, 1971, and said date was entered in the reserve section for 1971 at the rear of our office New York Lawyers Diary and Mannual [sic] for 1970." Subsequently, when counsel's office received the 1971 edition of the New York Lawyers Diary and Manual, the deadline for mailing the substitution motion was erroneously entered on the February 27, 1971 page instead of the January 27, 1971 page. It is asserted that the error was not uncovered until March 1, 1971, when this court notified counsel that it had set a date for argument on the substitution motion.

Defendant responded to these arguments in two ways. He relied on the *Graham* and *Johns Hopkins* cases, which were discussed earlier,[18] as authority precluding the court from granting the motion for substitution. His other response, by way of supplemental papers, called to the attention of the court that he had contacted Mrs. Yonofsky and that she had informed him that she had always known of the existence of plaintiff's will. This seems flatly to contradict the sworn statement in the affidavit of plaintiff's counsel that he was told no will existed. Thereafter, plaintiff's counsel questioned the propriety of defendant's contacting Mrs. Yonofsky and in having their telephone conversation transcribed without permission or warning. The court held a hearing to inquire into the facts surrounding the telephone call to Mrs. Yonofsky. The secretary who transcribed the conversation appeared and produced both her shorthand notes and a longhand tran-

18. *See* pp. 1010–1011 *supra.*

scription of the conversation. At the hearing it was established that except for the last few seconds the secretary had transcribed the entire conversation between Mr. Stull (defendant's attorney) and Mrs. Yonofsky. The transcript does not indicate that Mr. Stull advised plaintiff's widow that their conversation was being transcribed. In an affidavit filed the day after the hearing, Mr. Stull stated that before he closed his telephone conversation with Mrs. Yonofsky, he informed her that he "had notes made of [their] conversation," that he "would bring [their] discussion to the Judge's attention," and that he "suggested that she call Mr. Friedman" (plaintiff's counsel).

At the close of the hearing the court stated that it would study all papers bearing on the motion for substitution and would determine whether grievance consideration was indicated in regard to the conflicting affidavits.

After carefully considering this matter, the court is of the view that grievance proceedings are not indicated. The conflict is between the statement in Mr. Friedman's affidavit that Mrs. Yonofsky informed him that there was no will, and the statement in the affidavit of Mr. Stull, that Mrs. Yonofsky always knew of the existence of plaintiff's will. It should be noted that when Mr. Friedman inquired with respect to a will and was told there was none, it was early November 1970. This was only a short time after plaintiff's death on October 26, 1970. Mr. Stull revealed that when he asked Mrs. Yonofsky at what time she had sent plaintiff's will to Mr. Friedman's office, she answered, that it was about a month after her husband's death—*i. e.*, sometime after November 26, 1970. Mrs. Yonofsky explained that she waited a month before sending the will to Mr. Friedman for religious rea-

sons. The conflict between what Mr. Friedman was told—that there was no will—and what Mr. Stull was told—that Mrs. Yonofsky always knew that there was a will—appears to be irreconcilable. It might be that Mrs. Yonofsky was mistaken when she indicated to Mr. Friedman that there was no will. This is not improbable since the alleged conversation took place only a short time after her husband's death. Hence, she might have been under severe mental and emotional strain at that time. Nevertheless, based on the facts as presented it is impossible to conclude that Mr. Friedman's affidavit was either false or not made in good faith. Accordingly, the court will decide the application for an extension of time in which to move for substitution under the assumption that both sides have acted in good faith.

██ The executor seeking to be substituted for Yonofsky has offered two excuses for the failure to comply with the ninety-day provision of Rule 25(a)(1): (1) that there were significant difficulties in bringing about his appointment as executor; and (2) the "diary oversight" by plaintiff's counsel. In view of the wide discretion granted to the court in determining 6(b) motions,[19] and the liberal view of that discretion taken by most courts [20] and commentators,[21] the court believes that the instant motion should be granted. The movant has made the requisite showing of excusable neglect to justify this ruling. There have been at least two cases in this district in which clerical errors or similar inadvertent actions were the cause of untimely acts under the rules. Vandervelde v. Put and Call Brokers and Dealers Ass'n, 43 F.R.D. 14 (S.D.N.Y.1967); Colgate-Palmolive Co. v. North American Chemical Corp., 238 F.Supp. 81 (S.D.N.Y.1964). In both of these cases motions under Rule 6(b)(2)

19. *See* note 15 *supra*.

20. *See, e. g.*, Woods v. Allied Concord Financial Corp., 373 F.2d 733, 734 (5th Cir. 1967); Hoffman v. Kennedy, 30 F.R.D. 50, 51 (E.D.Pa.1962).

21. 2 J. Moore ¶ 6.08; 4 C. Wright & A. Miller, § 1165, at 619–20.

were granted. The 6(b) motion in *Vandervelde*, moreover, even arose in the same procedural posture—*i. e.*, an untimely motion for substitution—as the instant case.

Defendant's reliance on the previously discussed *Graham* and *Johns Hopkins* cases is unpersuasive. In the latter case the court reasoned as follows:

> A suggestion of . . . death was filed . . . . No motion for substitution was made by any of the parties to this case, or by the successors or representatives of either such deceased defendant, within the ninety day period after the filing of the suggestion of death as provided in Rule 25. Therefore, in accordance with the provisions of that rule, the complaint in this case is dismissed as to each of said two deceased defendants. 297 F. Supp. at 1165.

The court's language does not indicate whether any motion for substitution was filed after the ninety-day period. The court apparently was not faced with a decision under Rule 6(b)(2). The instant case is thus distinguishable on this ground. Consequently, the *Johns Hopkins* case is not authority for denying the instant motion under Rule 6(b)(2).

Although the court in *Graham* was faced with a motion under Rule 6(b), which it denied, there was a strong dissent by Judge J. Skelly Wright. This court shares the view articulated by Judge Wright that the opinion of the majority was incorrect.[22]

The leading case in this circuit, which discusses extensions of time for making motions under Rule 25(a)(1), is Staggers v. Otto Gerdau Co., 359 F.2d 292 (2d Cir. 1966). In that case the court rejected appellees' argument that the district judge was required to dismiss the action when no motion for substitution was made within the ninety-day period. The court stated that the "history of the 1963 amendment to Rule 25 makes clear that the 90 day period was not intended to act as a bar to otherwise meritorious actions." 359 F.2d at 296 (citation omitted). In this case the delay in making the motion to substitute was only two days. Although the court found "excusable neglect" for the short delay, it was also careful to point out "that the appellees suffered *no prejudice*" from the delay. *Id.* (emphasis added). It is not unreasonable to conclude from *Staggers* that "lack of prejudice" to a party opposing substitution is a key element to factor into a Rule 6(b) determination. This approach was approved in *Vandervelde*, in which another judge of this court attached " 'crucial importance' " to the absence of prejudice in granting a motion to extend the time in which a party could move for substitution. 43 F.R.D. at 20.

In the case under consideration there can be no prejudice to the party opposing the motion for substitution. The trial was completed before the plaintiff died. Under *Staggers* and *Vandervelde* this court must attach significant weight to this factor. When the "no prejudice" factor is added to the other elements discussed, the balance unequivocally tips in favor of granting the motion.

Accordingly, the motion for enlargement of time in which to move for substitution is granted. The motion to substitute Charles Winter, executor of the deceased plaintiff's estate, is likewise granted.

---

22. It should be observed that Judge Wright did not predicate his dissent on Rule 6(b). He based his view—that the motion for substitution should be granted—on Fed.R.Civ.P. 86(e), which provides that the 1963 amendments to the Federal Rules shall

> govern . . . all further proceedings in actions then pending, except to the extent that in the opinion of the court their application in a particular action pending when the amendments take effect would not be feasible or would work injustice, in which event the former procedure applies.

Judge Wright thought that application of the amended rule in *Graham* "would work an obvious injustice." 342 F.2d at 917.

## III. CHALLENGES TO JURISDICTION

During argument at trial and in his trial and posttrial memoranda defendant has attacked the subject matter jurisdiction of this court on three grounds: (1) plaintiff has not established diversity of citizenship; (2) the requisite jurisdictional amount is not in issue; and (3) plaintiff has failed to join an indispensable party, namely, Samarius, Inc., the corporation under which defendant has been operating the assets of the DeJur Potentiometer Division. It should be noted that defendant never formally moved for dismissal on jurisdictional grounds prior to trial. He did, however, deny the jurisdictional allegations of the complaint in his answer. For the reasons stated below all of defendant's jurisdictional objections are rejected.

■ Defendant's allegation that plaintiff has failed to establish diversity of citizenship is totally without merit and frivolous. Defendant seems to predicate this assertion on plaintiff's failure to submit a proposed finding of fact or conclusion of law with respect to the existence of diversity of citizenship.[23] Proposed findings of fact or conclusions of law do not limit the power of a court to make findings and conclusions of its own. Additionally, plaintiff has provided supplemental findings of fact and conclusions of law on the jurisdictional questions.

■ The complaint states that plaintiff was a "resident" of New York and that "[u]pon information and belief, defendant . . . is and was a resident of . . . Connecticut." Although defendant never specifically attacked the jurisdictional allegation on the ground that it averred "residence" rather than "citizenship," it is well settled that an allegation of diversity of residence does not satisfy the requirements of federal diversity jurisdiction.[24] Nevertheless, it is also settled that a defect of this sort does not require dismissal if it is otherwise clear that diversity of citizenship exists. *See, e. g.,* DeVries v. Starr, 393 F.2d 9, 11 (10th Cir. 1968); Pattiz v. Schwartz, 386 F.2d 300, 301 (8th Cir. 1968); Humphrey v. Fort Knox Transit Co., 58 F.Supp. 362, 363–364 (W.D.Ky.), aff'd, 151 F.2d 602 (6th Cir. 1945). It is firmly established that the question of citizenship is controlled by domicile.[25] Professor Wright has succinctly summarized the "elusive concept of 'domicile'"[26] as follows: "A person's domicile is that place where he has his true, fixed, and permanent home and principal establishment, and to which he has the intention of returning whenever he is absent therefrom."[27] In the case at bar, the record viewed in its collective significance, unequivocally reveals that plaintiff and defendant were domiciliaries of New York and Connecticut[28] at the time that this action was commenced.[29] Since citizenship

---

23. Defendant's Post-Trial Memorandum at 1–3.

24. *See, e. g.,* Delome v. Union Barge Line Co., 444 F.2d 225, 233 (5th Cir.), cert. denied, 404 U.S. 995, 92 S.Ct. 534, 30 L.Ed.2d 547 (1971); DeVries v. Starr, 393 F.2d 9, 10–11 (10th Cir. 1968); Pattiz v. Schwartz, 386 F.2d 300, 301 (8th Cir. 1968); White v. Fawcett Publications, 324 F.Supp. 403, 404–406 (W.D. Mo.1971); Holm v. Shilensky, 269 F. Supp. 359, 360–361 (S.D.N.Y.1967), aff'd, 388 F.2d 54 (2d Cir. 1968). Cf. Tanzymore v. Bethlehem Steel Corp., 325 F. Supp. 891 (E.D.Pa.1971), aff'd, 457 F.2d 1320 (3d Cir. 1972).

25. C. Wright, Federal Courts § 26 & n. 3 (2d ed. 1970).

26. *Id.*

27. *Id.* & nn. 4–5.

28. Plaintiff testified that he lived in Brooklyn, New York. Additionally, there was testimony indicating plaintiff's entire employment experience had been in New York. Moreover, there was no testimony indicating that plaintiff had any relationship with any state other than New York.
 Defendant testified that he lived and worked in Connecticut. Furthermore, defendant's business was located in Connecticut.

29. For purposes of jurisdiction, diversity is determined at the time the action is commenced. C. Wright, *supra*, note 25, § 28.

is determined by domicile, it is clear that the requirement of diverse citizenship [30] has been satisfied.

The second basis on which defendant challenges subject matter jurisdiction is that plaintiff has failed to prove the required jurisdictional amount. As noted earlier, the trial in this case was limited to the issue of liability; the question of damages was not litigated. Hence, the court will analyze this branch of defendant's attack on jurisdiction as if made in a pretrial motion to dismiss.

 From the face of the complaint it is evident that plaintiff has properly pleaded the requisite jurisdictional amount as required by Fed.R.Civ. P. 8(a)(1). The complaint states: "This is an action of a civil nature and the amount in controversy exceeds the sum or value of $10,000.00, exclusive of interest and costs." Since defendant challenged this assertion, it is necessary to evaluate plaintiff's allegation under the rules governing determination of the amount in controversy. When defendant puts in issue the validity of plaintiff's allegation with respect to the jurisdictional amount, it is incumbent on plaintiff to establish that the requisite amount is in controversy. McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1935); Nelson v. Keefer, 451 F.2d 289, 296 (3d Cir. 1971); Breault v. Feigenholtz, 380 F.2d 90, 92 (7th Cir.), cert. denied, 389 U.S. 1014, 88 S.Ct. 591, 19 L.Ed.2d 660 (1967); Post v. Payton, 323 F.Supp. 799, 804 (E.D.N.Y.1971); National Audubon Society, Inc. v. Johnson, 317 F.Supp. 1330, 1335 (S.D.Tex. 1970). Since the trial in the case under consideration was limited to liability, and since plaintiff had no discovery on damages, his burden in demonstrating that the amount in controversy comported with the statutory requirement was rendered more difficult. Plaintiff did, however, submit a post-trial Reply Memorandum addressed to this issue. It should be noted that although federal law is looked to in determining whether the amount claimed by plaintiff will withstand challenge by defendant, state law is considered in assessing the nature of the right asserted in a diversity action. Horton v. Liberty Mutual Insurance Co., 367 U.S. 348, 352–353, 81 S.Ct. 1570, 6 L.Ed.2d 890 (1961).

 In general a court will rule on this issue by considering the pleadings and other papers submitted. C. Wright, Federal Courts § 33 at 112 & n. 9 (2d ed. 1970). The guiding principles in evaluating disputes with respect to the amount in controversy were articulated by the Supreme Court in Saint Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 (1938). Speaking for the Court, Mr. Justice Roberts stated:

> The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls, if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal. The inability of plaintiff to recover an amount adequate to give the court jurisdiction does not show his bad faith or oust the jurisdiction. Nor does the fact that the complaint discloses the existence of a valid defense to the claim. But if, from the face of the pleadings, it is apparent, to a legal certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed. 303 U.S. at 288–289, 58 S.Ct. at 590 (footnotes omitted).

When a claim is made for liquidated damages [31] a court's task in applying the "good faith" and "legal certainty"

---

30. 28 U.S.C. § 1332(a) (1970).

31. The Supreme Judicial Court of Massachusetts defined the term liquidated damages as follows:

"Liquidated damages 'mean damages, agreed upon as to amount by the parties, or fixed by operation of law, or under the correct applicable principles

tests[32] of *Saint Paul* is relatively simple. Difficulty arises when the claim is for unliquidated damages.[33]

In the case under review *plaintiff, in his first cause of action, demands "one-half of all sums received by defendant by reason of defendant's acquisition and operation of the* former *Potentiometer Division* of DeJur-Amsco Corporation." (emphasis added). His second cause of action seeks *"one-half of the value of the Potentiometer Division . . . . or $25,000.00 at plaintiff's option, which consideration the defendant promised to pay to the plaintiff for his work, labor and services."* (emphasis added)

Both causes of action seek liquidated rather than unliquidated damages.[34] The first claim seeks damages that are susceptible to calculation. The second claim has alternative requests. The request for one-half of the value of the assets acquired by defendant from DeJur is subject to reasonably certain calculation. The alternative demand of $25,000.00 is, needless to say, a claim for liquidated damages.

Defendant asserts that for plaintiff to establish the requisite jurisdictional amount with respect to the first cause of action it would be necessary to

> establish a *profit* by Samarius, Inc., or at least to defendant, above reasonable salaries and return on a capital investment, rightfully made upon the allegations of the complaint. The profit would need to exceed $20,000, because plaintiff's claim is to an "equal" share of Samarius, Inc., or the alleged joint venture . . . .[35]

Since plaintiff has not had discovery on the question of damages, it is quite obvious that he cannot establish what defendant suggests he must demonstrate in order to confer jurisdiction on this court. Although the damages claimed by plaintiff fall within the definition of liquidated damages set out in the margin,[36] it is not possible to calculate actual damages because as stated earlier the damage issue was separated from the question of liability. It should be noted, however, that the alternative demand for $25,000.00 in plaintiff's second cause of action brings that claim squarely within the requisite jurisdictional amount. As to plaintiff's first cause of action—*i. e.,* for one-half of the profits defendant has derived from the acquisition and operation of the Potentiometer Division—the court must evaluate this claim under the *Saint Paul* test and the case law authority that has evolved therefrom. Our task in this regard is not dissimilar from that of a court when faced with a claim for unliquidated damages.

■ From the *Saint Paul* case it might be said that "a district court has the power to dismiss diversity suits when the court can conclude either that the sum claimed was not claimed in good faith or that the plaintiff cannot recover the amount demanded." Deutsch v. Hewes Street Realty Corp., 359 F.2d 96, 99 (2d Cir. 1966). But as Judge Waterman noted in *Deutsch,* "The end of clarity will be furthered, however, if the first test is seen to be but a linguistic variant of the second. . . ." *Id.* This analysis stems from Professor Wright's often

---

> of law made certain in amount by the terms of the contract, *or susceptible of being made certain in amount by mathematical calculations from factors which are or ought to be in the possession or knowledge of the party to be charged.'"* (emphasis added).
> Norwood Morris Plan Co. v. McCarthy, 295 Mass. 597, 602, 4 N.E.2d 450, 454 (1936), *quoting* Cochrane v. Forbes, 267 Mass. 417, 420, 166 N.E. 752, 753 (1929).

32. *See* note 37 *infra* and accompanying text.

33. One court defined unliquidated damages as damages that "rest in opinion only, and which cannot be ascertained by computation or calculation." Litsinger v. Ross, 185 Md. 154, 157, 44 A.2d 435, 436 (1945), citing, Steuart & Steuart v. Chappell, 98 Md. 527, 531, 533, 57 A. 17, 19, 20 (1904).

34. *See* notes 31 and 33 *supra.*

35. Defendant's Trial Memorandum, at 15.

36. *See* note 31 *supra.*

cited [37] query: "[U]nless it appears to a legal certainty that plaintiff cannot recover the sum for which he prays, how can it be held that his claim for that sum is not in good faith?" C. Wright, Federal Courts § 33, at 113 (2d ed. 1970). It follows then, as one Circuit has concluded, that the "test is not what amount the plaintiff claims in the *ad damnum* clause of his complaint, but rather, whether it appears to a 'legal certainty' that he cannot recover an amount above the jurisdictional minimum." Jaconski v. Avisun Corp., 359 F.2d 931, 934–935 (3d Cir. 1966) (citations omitted). *Accord*, Jeffries v. Silvercup Bakers, Inc., 434 F.2d 310, 311–312 (7th Cir. 1970). In the area of unliquidated damages, which is applicable by analogy to the instant case, two approaches to the "legal certainty" determination have evolved.

The first allows a district court to value plaintiff's claim and dismiss the case if from all the facts and circumstances it appears that the plaintiff cannot recover an amount in excess of the jurisdictional minimum. *See, e. g.*, Nelson v. Keefer, 451 F.2d 289 (3d Cir. 1972); [38] Leehans v. American Employers Insurance Co., 273 F.2d 72 (5th Cir. 1959); [39] Turner v. Wilson Line, 242 F.2d 414 (1st Cir. 1957). [40] The *Nelson* case exemplifies this approach. It was a personal injury action for unliquidated damages in which the court of appeals declared that a district court may evaluate the expenses of the plaintiff and the nature of his injury in determining that the jurisdictional amount is not legally certain. The court held that the "district court did not err in concluding that the statutory jurisdictional minimum could not be gleaned from the facts averred in support of the complaint. And since plaintiffs' legally recoverable ceiling did not at its apex reach the federal jurisdictional floor, the judgment of the district court [dismissing the action] will be affirmed." 451 F.2d at 298.

The other approach, often attributed to Wade v. Rogala, 270 F.2d 280 (3d Cir. 1959), [41] would permit all but the most flagrant cases to proceed to trial when an unliquidated damage claim is challenged on jurisdictional grounds. The rationale expressed for this view is that since the amount in controversy question is often closely linked to the merits, it would permit a court to decide the case under the guise of determining the jurisdictional issue and thus deny a litigant the ordinary incidents of trial. [42] Wade v. Rogala, 270 F.2d 280, 285 (3d Cir. 1959).

In adopting the latter more liberal view for the Second Circuit, the court of

---

37. *See, e. g.*, Jones v. Landry, 387 F.2d 102 (5th Cir. 1967), in which the court stated, "Thus, there is but one test: good faith and legal certainty are equivalents rather than two separate tests." *Id.* at 104.

38. The *Nelson* case seems to be a departure from the rule in the Third Circuit announced in Wade v. Rogala, 270 F.2d 280 (3d Cir. 1959).

39. The Fifth Circuit has apparently shifted to the more liberal view. Jones v. Landry, 387 F.2d 102 (5th Cir. 1967).

40. Discussing the First and Fifth Circuit cases cited in the text, Professor Wright has stated that, "Such action [dismissal based on a court's analysis of plaintiff's claim] comes dangerously close to depriving plaintiff of his right to a jury trial as to damages." C. Wright, *supra*, note 25, § 33, at 113.

41. Jones v. Landry, 387 F.2d 102 (5th Cir. 1967); Deutsch v. Hewes St. Realty Corp., 359 F.2d 96 (2d Cir. 1966); C. Wright, *supra*, note 25, § 33, at 111 & n. 7; Note, Determination of Federal Jurisdictional Amount in Suits on Unliquidated Claims, 64 Mich.L.Rev. 930, 933 (1966).

42. There is even some authority for the proposition that in those actions at law in which a right to trial by jury is guaranteed, issues of jurisdictional fact can be submitted to the jury. Shaffer v. Coty, Inc., 183 F.Supp. 662, 666–667 (S. D.Cal.1960). *See* Note, Trial by Jury of Preliminary Jurisdictional Facts in Federal Courts, 48 Iowa L.Rev. 471 (1963). But as one noted authority has observed, "This is not, however, the usual procedure." C. Wright, *supra* note 25, § 33, at 112.

appeals utilized a two pronged analysis. First, it was persuaded that to allow valuation of a claimant's unliquidated damage allegation when the jurisdictional issue was closely related to the merits, would be "tantamount to depriving the plaintiff of his present statutory rights to a jury trial." Deutsch v. Hewes Street Realty Corp., 359 F.2d 96, 99–100 (2d Cir. 1966). Secondly, the court attempted to balance competing interests while recognizing that federal courts are courts of limited statutory jurisdiction. The reasoning of the court was as follows:

> The choice is essentially between a rule on the one hand that allows some cases involving inflated claims for relief to be brought in a federal forum in order to insure access to that forum for all those cases that properly may be brought there, and, on the other hand, a rule that closes the doors to the federal forum in the face of some claims that properly could be brought there in order to insure the denial of the forum to cases involving inflated claims. The present statutory pattern requires that we choose between these alternatives, we feel the wiser choice is to choose the . . . more liberal rule, as typified by the decision in Wade v. Rogala. . . . If access to federal district courts is to be further limited it should be done by statute and not by court decisions that permit a district court judge to prejudge the monetary value of an unliquidated claim. 359 F.2d at 100 (footnote omitted).

■■■■ Under the rule in this circuit it appears that a district court can dismiss an action for failure to meet the prescribed jurisdictional amount only if the law governing the plaintiff's cause of action proscribes recovery above $10,000. In a diversity case a district court must be guided by state law in assessing the nature and scope of the right asserted by the claimant. Horton v. Liberty Mutual Insurance Co., 367 U.S. 348, 352–353, 81 S.Ct. 1570, 6 L.Ed.2d 890 (1961). In the instant case the right asserted by plaintiff is controlled by the substantive law of New York.

■■■■ It is clear that New York law permits an equitable action for accounting between joint adventurers.[43] Moreover, under New York law, when a joint venture transaction is completed and there is nothing to be done except to divide profits or share losses an action at law will lie. See, e. g., Cole v. Forman, 274 App.Div. 818, 80 N.Y.S.2d 350 (2d Dept. 1948); Bigelow v. McMillin, 251 App.Div. 456, 458, 296 N.Y.S. 533, 536 (1st Dept. 1937). An action at law will also lie when there is a breach of a joint venture agreement and no business has been transacted under the agreement—i. e., when one joint adventurer is excluded by another. Crownshield Trading Corp. v. Earle, 200 App.Div. 10, 192 N.Y.S. 304 (1st Dept. 1922); Glenmark, Inc. v. Carity, 30 Misc.2d 1065, 221 N.Y.S.2d 330 (Sup.Ct.N.Y.County 1961). Thus we may conclude that plaintiff is accorded both equitable and legal remedies under the substantive law of New York. These remedies are granted without any specific limitation with respect to the amount that may be recovered. Hence, there is no legal prohibition preventing plaintiff from recovering an amount in excess of the jurisdictional limit. Moreover, since there has been

---

43. Marston v. Gould, 69 N.Y. 220 (1877); Rhodes v. Little Falls Dairy Co., 230 App.Div. 571, 245 N.Y.S. 432 (4th Dept. 1930, aff'd 256 N.Y. 559, 177 N.E. 140 (1931); Boice v. Jones, 106 App.Div. 547, 94 N.Y.S. 896 (1st Dept. 1905); Josias v. Sugar Prods. Co., 169 N.Y.S. 887 (Sup.Ct. Kings County 1918), aff'd, 187 App.Div. 905, 174 N.Y.S. 908 (2d Dept. 1919); Kirkwood v. Smith, 47 Misc. 301, 95 N.Y.S. 926 (Sup.Ct.N.Y.County 1905), aff'd, 111 App.Div. 923, 96 N.Y.S. 1132 (1st Dept. 1906); Bradley v. Wolff, 40 Misc. 592, 83 N.Y.S. 13 (Sup.Ct.N.Y. County 1903); cf. Schantz v. Oakman, 10 App.Div. 151, 41 N.Y.S. 746 (1st Dept. 1896), aff'd, 163 N.Y. 148, 57 N.E. 288 (1900); Lester v. Rubinstein, 156 N.Y.S. 2d 518 (Sup.Ct.N.Y.County 1956), modified on other grounds, 3 A.D.2d 902, 162 N.Y.S.2d 707 (1st Dept.1957). See also Robie v. Ofgant, 306 F.2d 656, 660–661 (1st Cir. 1962).

no discovery on damages, the court can not conclude that the facts adduced preclude plaintiff from recovering damages equal or in excess to the requisite amount. Consequently, the court must reject defendant's second challenge to the jurisdiction of this court.

The third and final ground on which defendant challenges subject matter jurisdiction concerns the failure of plaintiff to join an alleged indispensable party.

 In both his trial memorandum [44] and at trial, at the close of plaintiff's case,[45] defendant has asserted that Samarius, Inc.[46] is an indispensable party [47] to this litigation. The failure to join Samarius, Inc. is deemed "fatal to this action" by defendant. At the outset it should be noted that "in a diversity case the question of joinder is one of federal law." Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 125 n. 22, 88 S.Ct. 733, 746, 19 L.Ed.2d 936 (1968) (citation omitted). The Supreme Court has recognized, however, that "state-law questions may arise in determining what interest the outsider actually has [citation omitted] but the ultimate question whether, given those state-defined interests, a federal court may ·proceed without the outsider is a federal matter." *Id.* One noted authority has heartily endorsed this view:

> This is in accord with the better earlier decisions, and is a sound resolution of the question. It seems not inconsistent with that rule to say that if, as a matter of substantive law, a state does not recognize that a plaintiff has a particular right of action unless he joins with him certain others, then the federal court in a diversity action is precluded from giving a plaintiff who fails to join those others an opportunity to proceed as though alone he had the substantive right.[48]

 Under New York substantive law a joint venture may not be carried on by individuals through a corporate form.[49] Weisman v. Awnair Corp. of America, 3 N.Y.2d 444, 165 N.Y.S.2d 745, 144 N.E.2d 415 (1957); Lauto v. Muller, 36 Misc.2d 208, 231 N.Y.S.2d 947 (Sup.Ct.N.Y.County 1962); Loverdos v. Vomvouras, 23 Misc.2d 464, 200 N.Y.S. 2d 921 (Sup.Ct.N.Y.County 1960); Marathon Motors, Inc. v. Atlas Buick Co., 150 N.Y.S.2d 289, 292 (Sup.Ct.

44. *Defendant's Trial Memorandum, at* 15.

45. Transcript of April 15, 1970, at 169 [hereinafter cited as Tr.]

46. *See* note 4 *supra.*

47. The term "indispensable party" is no longer used. Fed.R.Civ.P. 19 was extensively amended in 1966 in an attempt to overcome inadequacies under the former rule. *See generally* 3A J. Moore, ¶ 19.01 [5.2].

One court has aptly stated that the amended rule was intended to "eliminate the confusion which has long surrounded the old Rule 19 by eliminating the categories and ritual inherited from Shields v. Barrow [17 How. 130, 15 L.Ed. 158]." Rippey v. Denver U.S. Nat. Bank, 260 F.Supp. 704, 708 (D.Colo.1966); C. Wright, *supra,* note 25, § 70, at 300–01. It should be noted that Rule 19(b) does use the word "indispensable" to describe a person whose joinder is necessary for a just adjudication under Rule 19(a). But even if a party is needed for a just adjudication under Rule 19(a) a court must undertake the pragmatic analysis contemplated by Rule 19 (b) before deciding whether an action should be dismissed. See Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed. 2d 936 (1968), rev'g, Provident Tradesmens Bank & Trust Co. v. Lumbermans Mut. Cas. Co., 365 F.2d 802 (3d Cir. 1966).

48. C. Wright, *supra,* note 25, § 70, at 301–02, citing, Stevens v. Loomis, 223 F. Supp. 534, 536 (D.Mass.1963), aff'd, 334 F.2d 775 (1st Cir. 1964). *But see* Note, *supra* note 41, at 980.

49. New York law represents the minority view on this question. *See* 2 S. Williston, Contracts § 318C, at 619 & n. 10 (3d ed. W. Jaeger 1959) [hereinafter cited as 2 S. Williston]. For a critical commentary on the New York rule see Conway, The New York Fiduciary Concept in Incorporated Partnerships and Joint Ventures, 30 Fordham L.Rev. 297 (1961).

Kings County 1956); cf. Lester v. Ennis, 25 Misc.2d 334, 202 N.Y.S.2d 878 (Sup.Ct.N.Y.County 1960), aff'd, 12 A.D.2d 921, 212 N.Y.S.2d 1000 (1st Dept. 1961). When joint adventurers carry on their business through a corporate entity they cease being joint adventurers and assume the rights, duties and obligations of stockholders. Weisman v. Awnair Corp. of America, 3 N.Y.2d 444, 165 N.Y.S.2d 745, 144 N.E.2d 415 (1957); Hochen v. Rubin, 24 A.D.2d 254, 265 N.Y.S.2d 554 (1st Dept. 1965), aff'd, 18 N.Y.2d 866, 276 N.Y.S.2d 119, 222 N.E.2d 737 (1966). In the instant case, plaintiff contends that he and defendant entered into a joint venture agreement to acquire and thereafter operate the assets of the DeJur Potentiometer Division. Plaintiff claims that he was excluded form the alleged joint venture at the point when defendant acquired the DeJur assets. Had plaintiff not been excluded, and had the parties operated the DeJur Potentiometer Division in a corporate form with each of them owning a one-half interest in the corporation, they would not have been joint venturers, but rather, would have been shareholders in the corporation. It is not unusual for parties to enter into a joint venture agreement, and thereafter to operate their business in corporate form. But when the corporation is formed the joint venture relationship ceases. Farber v. Romano, 232 N.Y.S.2d 285 (Sup.Ct. Suffolk County 1962). In the instant case plaintiff was excluded from the alleged joint adventure prior to the formation of the corporation by defendant. When plaintiff was excluded, therefore, the only relationship that could have existed between the parties was that of a joint venture. Hence, it appears that plaintiff's cause of action, if any, is against defendant and not against the corporation that defendant formed. Cf. Krendell v. Moscow, 20 Misc.2d 551, 194 N.Y.S.2d 154 (Sup.Ct. N.Y.County 1959). In any event, it seems clear that New York substantive law does not mandate that a claimant, excluded from a joint venture, join as a party defendant, a corporation formed to operate the business which was the subject of the joint venture, in bringing an action against his alleged coadventurer.

■ Since the substantive law which defines the nature and scope of plaintiff's cause of action does not require joinder of Samarius, Inc., the court can evaluate defendant's assertion—that Samarius is an indispensable party—free from considerations of state law and the concomitant difficulties in a diversity action of applying state substantive law, as required by Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and federal procedural law, as mandated by Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).

■ Whether joinder of a nonparty is compelled—i. e., necessary for a just adjudication—is determined by Fed.R. Civ.P. 19(a).[50] Notwithstanding the enumerated factors in Rule 19(a), which a court must, of course, take into account, there is no definite method for determining whether a nonparty must be joined. See Bixby v. Bixby, 50 F.R.D.

50. Rule 19(a) provides:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.

277, 280 (S.D.Ill.1970) (emphasizing "the necessity of weighing the factual cause in light of the factors enumerated in Rule 19 and all other relevant factors"). Any decision must, therefore, consider the overall policy considerations underlying the rule. Three basic policy objectives fostered by the rule are: (1) avoidance of unnecessary or multiple litigation; (2) providing complete relief to the parties before the court; and (3) protection of the rights and interests of any absent parties. *See generally* 7 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1602 (1972). Additionally, it should not be overlooked that "the philosophy of present Rule 19 is to avoid dismissal whenever possible . . . ." Heath v. Aspen Skiing Corp., 325 F.Supp. 223, 229 (D.Colo. 1971).

■ After carefully weighing the specific elements set out in Rule 19(a), the policy factors that the rule seeks to foster and other relevant considerations, the court concludes that the joinder of Samarius, Inc., is not necessary for a just adjudication of the instant controversy. Under Rule 19(a)(1) a court must consider whether complete relief can be accorded to the parties in the absence of the nonparty. In this case plaintiff's cause of action is against defendant for wrongfully excluding plaintiff from the alleged joint adventure. Plaintiff asserts that the joint venture came into existence long before the nonparty (Samarius, Inc.) was formed. The function of the court is to decide whether plaintiff's cause of action is meritorious. That the subject matter of the alleged joint venture—*i. e.*, the DeJur Potentiometer Division—was operated by defendant through the corporate entity of the nonparty is wholly irrelevant to that function. Plaintiff seeks nothing from the nonparty. His first cause of action seeks an accounting from defendant. As stated earlier, New York law provides for an equitable accounting in an action

between joint adventurers.[51] It also permits an action at law for damages when one party to a joint venture breaches the agreement before any business is transacted by excluding another party.[52] This is exactly what plaintiff claims happened in the case at bar. Plaintiff asserts that he entered into a joint venture agreement with defendant to acquire and thereafter operate the assets of the DeJur Potentiometer Division. He further alleges that after defendant acquired these assets he excluded plaintiff from the venture. The wrong, if any, was committed by defendant. Hence, the court can grant complete relief without the presence of Samarius, Inc. This conclusion is given added support because the trial in this case was limited to the question of liability. Certainly with respect to this issue, it is clear that complete relief can be accorded without the presence of any absentee party.

As to the second factor set out in Rule 19(a), from the above analysis it can be concluded that Samarius, Inc. claims no interest in the subject matter of the action between plaintiff and defendant. Whether plaintiff seeks an accounting in equity or damages at law against defendant, Samarius, Inc., has no interest in the controversy. It might be otherwise had plaintiff brought an action for specific performance of the joint venture agreement and sought a fifty-percent interest in Samarius, Inc. But the court need not consider this point since plaintiff only seeks monetary relief against defendant. From this analysis the court concludes that Samarius has no interest that might be prejudiced if it is not joined. Fed.R.Civ.P. 19(a)(2)(i).

The last factor explicitly contemplated by Rule 19(a) in evaluating joinder of persons needed for a just adjudication, is whether the failure to join an absentee party may "leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or

---

51. *See* note 43 *supra*, and accompanying text.

52. *See* p. 1020 *supra*.

otherwise inconsistent obligations by reason of the . . . [absentee's] claimed interest." Fed.R.Civ.P. 19(a) (2)(ii). Since it has been determined that the nonparty has no interest, there is no "substantial risk" that a party will incur multiple or inconsistent obligations by virtue of the failure to join Samarius, Inc.

From the analysis of the factors enumerated in Rule 19(a), it can be concluded that Samarius, Inc. is not a party needed for a just adjudication. In view of this disposition it is unnecessary to apply the pragmatic considerations of Rule 19(b) to determine whether the action should go forward without the absentee party.

## IV. DEFENDANT'S AMENDMENTS TO THE PLEADINGS

Defendant was given leave during the pretrial stage by Judge Tyler to apply at trial for "leave to amend [his] answer. . . ." [53] At the start of the trial defendant moved to amend the answer by adding a second, third and fourth defense. These requested amendments are set out in the margin.[54]

The application to add the second defense was expressly denied at trial.[55] The court was of the opinion that the matter raised in the second defense was amply covered by the general denial of the contract. The third defense was also considered at trial and it too seemed to be covered by the general denial regarding the existence of an oral joint venture contract. Nevertheless, since it is not absolutely clear from the transcript whether the third defense was disposed of,[56] the court rules that it, like the second defense, is covered by the general denial of the contract. Leave to add the fourth proposed defense—that the agreement, if any, violated the statute of frauds—was expressly granted at trial. Accordingly, the court will analyze the statute of frauds defense.

The parties devoted a substantial amount of time to argument of the statute of frauds issue. It has been plaintiff's contention that the statute of frauds is inapplicable to a joint venture. Defendant on the other hand, relying in large part on the opinion of this court in Backus Plywood Corp. v. Commercial Decal, Inc., 208 F.Supp. 687 (S.D.N.Y. 1962), modified, 317 F.2d 339 (2d Cir.), cert. denied, 375 U.S. 879, 84 S.Ct. 146, 11 L.Ed.2d 110 (1963), asserts that the alleged oral contract is squarely within the statute of frauds.[57] Defendant's reliance on Backus Plywood is misplaced and his citation to other authority [58] is likewise unpersuasive.

---

53. Judge Tyler's order of December 18, 1968 is appended to the final Pretrial Order.

54. AS A SECOND DEFENSE

6. That plaintiff did not have the "peculiar, unique and close relationship with DeJur Amsco Corporation and its officers and directors to initiate, influence, arrange and facilitate" the acquisition alleged by plaintiff, and there was a failure of consideration for the transaction upon which plaintiff's claim is based.

AS A THIRD DEFENSE

7. Defendant repeats and reiterates each and every allegation contained in paragraph "6" hereof, as if now fully and at length set forth.

8. That in addition thereto, plaintiff for his sole interest and profit, during the period of plaintiff's alleged contract with defendant, solicited one or more third parties to acquire the assets upon which plaintiff's alleged contract with defendant was made.

9. That by reason of the foregoing, the alleged contract between plaintiff and defendant lacked mutuality and is not binding and not enforceable.

AS A FOURTH DEFENSE

10. That the contract alleged by the plaintiff was within the Statute of Frauds of the State of New York, and is void and unenforceable.

55. Tr. 303.

56. Tr. 303–05.

57. N.Y.Pers.Prop.Law § 31(10) (McKinney's Consol.Laws, c. 41, 1962), as amended, N.Y.Gen.Oblig.Law § 5–701 (10) (McKinney's Consol.Laws, c. 24–A, 1964).

58. General Overseas Corp. v. Republic Pictures Int'l Corp., 74 F.Supp. 698 (S.D. N.Y.1947); Minichiello v. Royal Business

■ The law is clear in this area. It is well settled that the statute of frauds is generally inapplicable to a joint adventure agreement. This view is shared by the treatise writers,[59] other commentators [60] and the courts of almost every jurisdiction.[61] New York law is in accord with this view. *See e. g.*, Dayvault v. Baruch Oil Corp., 211 F.2d 335 (10th Cir. 1954) (applying both New York and Wyoming law); In re Taub, 4 F.2d 993 (2d Cir. 1924) (applying New York law); Wooten v. Marshall, 153 F. Supp. 759 (S.D.N.Y.1957) (applying both New York and Alaska law); Eidelberg v. Zellermayer, 5 A.D.2d 658, 174 N.Y.S.2d 300 (1st Dept. 1958), aff'd, 6 N.Y.2d 815, 188 N.Y.S.2d 204, 159 N.E. 2d 691 (1959); Weisner v. Benenson, 275 App.Div. 324, 89 N.Y.S.2d 331 (1st Dept. 1949), aff'd, 300 N.Y. 669, 91 N. E.2d 325 (1950); Clyde v. Schaller, 263 App.Div. 844, 31 N.Y.S.2d 686 (2d Dept. 1941); Glenmark, Inc. v. Carity, 30 Misc.2d 1065, 221 N.Y.S.2d 330 (Sup. Ct.N.Y.County 1961). *Cf.* Sanger v. French, 157 N.Y. 213, 51 N.E. 979 (1898); Cohen v. Bass, 138 App.Div. 504, 123 N.Y.S. 395 (2d Dept. 1910).

In the *Eidelberg* case Judge (then Justice) Breitel declared:

On appeal in the Appellate Division, in a very carefully prepared brief, plaintiff was at pains to urge that he was not suing upon a sale but upon a joint venture. *He pointed out, correctly, that the statute of frauds did not apply to joint ventures.* 5 A.D.2d at 662, 174 N.Y.S.2d at 303 (emphasis added).

Funds Corp., 18 N.Y.2d 521, 277 N.Y.S.2d 268, 223 N.E.2d 793 (1966), cert. denied, 389 U.S. 820, 88 S.Ct. 41, 19 L.Ed.2d 72 (1967); Clivner v. Ackerman, 51 Misc.2d 856, 274 N.Y.S.2d 112 (Sup.Ct.N.Y.County 1966), aff'd, 30 A.D.2d 642, 291 N.Y.S. 2d 759 (1st Dept. 1968); Sorge v. Nott, 34 Misc.2d 545, 226 N.Y.S.2d 57 (Sup.Ct. N.Y.County 1962), rev'd, 22 A.D.2d 768, 253 N.Y.S.2d 546 (1st Dept. 1964); Lounsbury v. Bethlehem Steel Corp., 53 Misc.2d 151, 277 N.Y.S.2d 700 (Civ.Ct. City of N.Y.1967); Schwartz v. Mayer, 198 Misc. 210, 97 N.Y.S.2d 773 (N.Y.C. Mun.Ct.1950).

In Wooten v. Marshall, 153 F.Supp. 759 (S.D.N.Y.1957), Judge Bryan found that, "No particular form of expression is required to create . . . [a joint venture] agreement apart from the requirements generally applicable to simple contracts." *Id.* at 763. There the court specifically rejected a motion for summary judgment, Fed.R.Civ.P. 56, by defendant on the basis that the alleged joint venture violated the statute of frauds. Many of the cases cited for the proposition that the statute of frauds is inapplicable to joint ventures concerned joint ventures to purchase real property. *E. g.* Wooten v. Marshall, 153 F.Supp. 759 (S.D.N.Y.1957); Weisner v. Benenson, 275 App.Div. 324, 89 N.Y.S.2d 331 (1st Dept. 1949), aff'd, 300 N.Y. 669, 91 N.E.2d 325 (1950); Glenmark, Inc. v. Carity, 30 Misc.2d 1065, 221 N.Y.S.2d 330 (Sup.Ct.N.Y.County 1961). This court has previously stated the rationale for this line of cases as follows:

The distinction is drawn between oral contracts for the sale, transfer or creation of an interest in real property and a venture to deal in realty. As to the latter the realty is viewed as personal property among the partners to the venture, and the requirements of the statute of frauds relating to real property are not applicable. Backus Plywood Corp. v. Commercial Decal, Inc., 208 F.Supp. 687, 694 (S.D.N.Y. 1962) (citations omitted), modified, 317 F.2d 339 (2d Cir.), cert. denied, 375 U.S. 879, 84 S.Ct. 146, 11 L.Ed.2d 110 (1963).

59. 2 A. Corbin, Contracts § 411 (1950). *See* 2 S. Williston, § 318A.

60. *See, e. g.*, Nichols, Joint Ventures, 36 Va.L.Rev. 425, 435 (1950); Taubman, What Constitutes a Joint Venture, 41 Cornell L.Q. 640 (1956).

61. *See* cases cited by the following sources: 2 A. Corbin, *supra* note 59, § 411 & n. 41; 2 S. Williston, § 318A & n. 18; 46 Am. Jur.2d Joint Ventures § 8 & n. 8 (1969); 48 C.J.S. Joint Adventures § 3 & nn. 25, 26, 36, 37 (1947); 32 N.Y.Jur. Joint Adventures § 7 & n. 13 (1963).

That the instant action did not, at least with regard to the DeJur Potentiometer Division, concern an agreement of joint venture to acquire real property is of no moment. An agreement between parties to engage in a joint venture is what is outside the scope of the statute of frauds. Whether the object of that joint venture agreement is the acquisition of real property or something else is irrelevant. *See, e. g., Clyde v. Schaller*, 263 App.Div. 844, 31 N.Y.S. 2d 686 (2d Dept. 1941) (oral joint venture agreement to divide profits from a contract for the alteration of a building); *Montenegro v. Roxas*, 141 N.Y.S. 2d 681 (Sup.Ct.N.Y.County 1955) (oral agreement to purchase goods and sell them to customers solicited by a coadventurer held to constitute a joint venture).

 It should be noted, however, that courts will not countenance attempts to circumvent the statute of frauds by allowing a party to claim that a transaction was a joint venture when the facts do not support a finding of joint venture. *See e. g.*, Weisner v. Benenson, 275 App.Div. 324, 89 N.Y.S.2d 331 (1st Dept. 1949), aff'd, 300 N.Y. 669, 91 N.E.2d 325 (1950).[62] Furthermore, the inapplicability of the statute of frauds to joint venture agreements does not protect transactions between coadventurers that are otherwise subject to the statute. Hence, if in furtherance of an alleged joint adventure one party to the agreement transfers real property to a coadventurer, the transaction is subject to the statute of frauds. Backus Plywood Corp. v. Commercial

Decal, Inc., 317 F.2d 339, 342 (2d Cir.), cert. denied, 375 U.S. 879, 84 S.Ct. 146, 11 L.Ed.2d 110 (1963). But if coadventurers agree to combine their financial resources to acquire property from a third party, the agreement to join together in this venture is not subject to the statute. Nevertheless, when the parties, after joining together, actually effectuate their purchase from a third party, that transaction if otherwise subject to the statute of frauds must be in writing. To illustrate these concepts, assume that A and B agree to engage in a joint adventure. The object of the joint venture is to acquire Blackacre from the XYZ Corporation, to subdivide Blackacre, sell the subdivided tracts and split the expected profits from the sales. The agreement to engage in this venture is not subject to the statute of frauds. But the actual transfer of Blackacre to A and B from the XYZ Corporation is a transaction that is subject to the statute of frauds and must, of course, be in writing.

The case law discussed establishes that generally a joint venture agreement is not subject to the statute of frauds. One rationale for this conclusion has already been discussed—*i. e.*, contracts of joint venture to acquire real property from third parties. But this is not the sole ground on which the courts have pitted their analysis that the statute of frauds is inapplicable to joint ventures. Generally, parties seeking to invoke the statute of frauds as a defense to an action brought by a coadventurer have pointed to the section of the statute of frauds that requires a writing for trans-

---

62. The language of the *Weisner* court is most instructive:

If there was merely an oral contract between plaintiff and defendant Benenson for the purchase of real property as tenants in common, plaintiff is barred from recovery by the statute of frauds, section 259 of the Real Property Law. On the other hand, if it was, as has been held, a contract for a partnership or joint venture in lands, no writing was necessary. Chester v. Dickerson, 54 N. Y. 1, 13 Am.Rep. 550; Mattikow v.

Sudarsky, 248 N.Y. 404, 162 N.E. 296.
The legal distinction for many years has caused parties desiring to enforce oral contracts for the conveyance of land to endeavor to spell out joint ventures or partnerships, in order to escape the bar of the statute of frauds. The evidence in litigations of this kind should be scrutinized in order to determine whether the facts warrant a conclusion that a joint venture of partnership was formed. 275 App.Div. at 325, 89 N.Y.S.2d at 332.

actions that cannot be completed within one year [63] as precluding oral joint venture agreements. *See, e. g.,* Backus Plywood Corp. v. Commercial Decal Inc., 208 F.Supp. 687 (S.D.N.Y.1962), modified, 317 F.2d 339 (2d Cir.) cert. denied, 375 U.S. 879, 84 S.Ct. 146, 11 L.Ed.2d 110 (1963), in which defendant asserted this defense. *Id.* at 693–695. There is authority indicating that when the duration of a joint venture is not fixed by agreement [64] and when the venture is not formed for a particular purpose to be accomplished by an agreed upon method,[65] then the joint venture is terminable at will by any party to the adventure. *See, e. g.,* Weisman v. Awnair Corp. of America, 3 N.Y.2d 444, 450, 165 N.Y.S.2d 745, 750, 144 N.E.2d 415, 418 (1957); Bing v. Morgan Guaranty Trust Co., 17 A.D.2d 132, 232 N.Y.S.2d 832 (1st Dept. 1962); Deeb v. Goryeb, 258 App.Div. 93, 15 N.Y.S.2d 617 (1st Dept. 1939); *cf.* Armstrong v. Rickard, 199 App.Div. 880, 192 N.Y.S. 502 (1st Dept. 1939). Hence, since a joint venturer, under certain circumstances may terminate the agreement at any time, he may do so within a year from the time that the agreement was consummated. Accordingly, the statute of frauds provision requiring a writing for agreements that cannot be performed within one year is deemed inapplicable. *See* Glenmark, Inc. v. Carity, 30 Misc.2d 1065, 1068–1069, 221 N.Y.S.2d 330, 333–334 (Sup.Ct.N.Y.County 1961).

Earlier it was stated that defendant's reliance on *Backus Plywood* was misplaced. Discussion of this point seems appropriate. Briefly, the operative facts *Backus Plywood* are as follows:[66] Plaintiff alleged that one of its officers (Alfred H. Sachs, its secretary-treasurer) discussed the feasibility of reorganizing the corporate defendant (Commercial Decal, Inc.) with Alfred Duhrssen,

president of the corporate defendant. Duhrssen was also the holder of a substantial stock interest in the corporate defendant. Although no agreement on Sach's proposals was ever reduced to writing, there was a significant amount of discussion by both parties regarding these proposals. Plaintiff asserted that the negotiations resulted in the consummation of an oral agreement, which it described as a "joint venture agreement." The alleged agreement contemplated the formation of a new corporation to "acquire certain assets from Decal, continue its business, lease its buildings and improvements, and employ Duhrssen as president and general manager at a fixed salary plus a share of the profits." 208 F.Supp. at 689. It was further contended that plaintiff was to be sole owner of the stock of the new corporation. The agreement was supposed to be reduced to writing within a month from the time of the alleged oral agreement. When the asserted agreement failed to materialize, plaintiff brought suit against both Commercial Decal and Duhrssen. The complaint asserted three causes of action. Two against the corporate defendant and one against Duhrssen. On defendant's motion for summary judgment with respect to the claims against the corporate defendant, this court found that the transactions asserted fell within the statute of frauds and dismissed those claims. On appeal the court of appeals upheld this conclusion. In analyzing plaintiff-appellant's theory that the alleged oral agreements constituted a joint venture to which the statute of frauds was inapplicable, Judge Hays reasoned as follows:

[A]ppellant urges that the agreement alleged is a "joint venture" agreement, and cites such decisions as . . . [citations omitted] for the

---

63. *See, e. g.,* N.Y.Gen.Oblig.Law § 5–701 (1) (McKinney 1964).

64. 32 N.Y.Jur., *supra* note 61, § 12.

65. *Id.* at 286 & n. 1.

66. For a fuller discussion of facts see Backus Plywood Corp. v. Commercial Decal, Inc., 208 F.Supp. 687, 688–690 (S.D.N.Y.1962), modified, 317 F.2d 339 (2d Cir.), cert. denied, 375 U.S. 879, 84 S.Ct. 146, 11 L.Ed.2d 110 (1963).

proposition that the statute of frauds does not apply to such agreements. Passing the dubious question of whether the alleged agreement constituted a joint venture . . ., it is clear that the principle of the cases cited applies only to joint ventures to make purchases from or transact business with *third parties*. In such situations it is held that the fact that the agreement contemplates future purchases by the venturers from third parties does not bring it within the statute of frauds. Dayvault v. Baruch Oil Corp., supra, 211 F.2d at 339, and cases there cited. But the label "joint venture" will not remove the bar of the statute when, as here, the very essence of the asserted venture is a sale from one "venturer" to the other. See Murnane v. Maxson Electronics Corp., 221 N.Y.S.2d 1015, 1017 (Sup. Ct.Suffolk County 1961). 317 F.2d at 342 (emphasis in original) (footnote omitted).

In the case at bar, the alleged joint venture contemplated purchase of property from a third party, namely DeJur. It was not an agreement, as in *Backus Plywood*, between the asserted coadventurers. Accordingly, the statute of frauds analysis presented in *Backus Plywood* is inapplicable to the instant controversy. The other cases cited by defendant [67] in support of his statute of frauds argument are not in point. In one of these cases, although an oral contract was asserted, there was a written memorandum that was never reduced to a formal contract. It was contended that the memorandum satisfied the statute of frauds. But the court found that an essential term of the asserted contract—*i. e.*, price—was not contained in this memorandum. Therefore, the memorandum did not comply with the statute of frauds. General Overseas Corp. v. Republic Pictures International Corp., 74 F.Supp. 698 (S.D.N.Y.1947). Accordingly, this case is distinguishable from the controversy under consideration and does not support defendant's statute of frauds claim. The other cases cited by defendant all concerned suits by business brokers or finders for commissions based on oral agreements.[68] In some instances the plaintiffs sought recovery on a *quantum meruit* theory [69] as well as on the oral agreement. In each of these cases the claims of the plaintiffs were barred by the statute of frauds. In pertinent part the statute of frauds provided:

Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking;

10. Is a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest. This provision shall not apply to a

67. *See* note 58 *supra*.

68. Minichiello v. Royal Business Funds Corp., 18 N.Y.2d 521, 277 N.Y.S.2d 268, 223 N.E.2d 793 (1966), cert. denied, 389 U.S. 820, 88 S.Ct. 41, 19 L.Ed.2d 72 (1967); Clivner v. Ackerman, 51 Misc. 2d 856, 274 N.Y.S.2d 112 (Sup.Ct.N.Y. County 1966), aff'd, 30 A.D.2d 642, 291 N.Y.S.2d 759 (1st Dept. 1968); Sorge v. Nott, 34 Misc.2d 545, 226 N.Y.S.2d 57 (Sup.Ct.N.Y.County 1962), rev'd, 22 A.D.2d 768, 253 N.Y.S.2d 546 (1st Dept. 1964); Lounsbury v. Bethlehem Steel Corp., 53 Misc.2d 151, 277 N.Y.S.2d 700 (Civ.Ct.City of N.Y.1967); Schwartz v. Mayer, 198 Misc. 210, 97 N.Y.S.2d 773 (N.Y.C.Mun.Ct.1950).

69. Minichiello v. Royal Business Funds Corp., 18 N.Y.2d 521, 277 N.Y.S.2d 268, 223 N.E.2d 793 (1966), cert. denied, 389 U.S. 820, 88 S.Ct. 41, 19 L.Ed.2d 72 (1967). *Cf.* Lounsbury v. Bethlehem Steel Corp., 53 Misc.2d 151, 277 N.Y.S. 2d 700 (Civ.Ct.City of N.Y.1967); Schwartz v. Mayer, 198 Misc. 210, 97 N.Y.S.2d 773 (N.Y.C.Mun.Ct.1950).

contract to pay compensation to an auctioneer, an attorney at law or a duly licensed real estate broker or real estate salesman.[70]

 The statute set out above, which governs the action under consideration, as well as the amended statute quoted in the margin,[71] are aimed at a middleman—broker or finder—who arranges a transaction between two outsiders. In the situations covered by these statutes the broker or finder claims no interest in the completed transaction. All he is concerned with is a fee or commission for arranging the transaction. This is not the situation in the case at bar, at least with respect to plaintiff's first cause of action. In this instance plaintiff claims that he entered into a joint venture with defendant and that his consideration for the contract of joint adventure was to procure from the De-Jur-Amsco Corporation the assets of its Potentiometer Division. He asserts defendant was to supply the financing for the purchase as his consideration for the joint venture agreement. Plaintiff was not claiming a fee or commission for arranging the transaction as were the claimants in the cases cited by defendant. Accordingly, the case at bar is distinguishable from the authority relied on by defendant and the statute of frauds assertion of defendant under subdivision 10 of N.Y.Pers.Prop.Law § 31 (McKinney 1962), as amended, N.Y.Gen.Oblig. Law § 5–701 (McKinney, 1964) is inapposite with respect to plaintiff's first cause of action.

 On the other hand, plaintiff's second cause of action seems squarely to come within the statute of frauds argument asserted by defendant. In relevant part the second cause of action asserts:

That heretofore and between the 21st day of April, 1963 and the 30th day of September, 1963 plaintiff at the special instance and request of the defendant, performed certain work, labor and services for the defendant,

---

**70.** N.Y.Pers.Prop. Law § 31 (McKinney 1962), as amended, N.Y.Gen.Oblig. Law § 5–701(10) (McKinney 1964). Section 31 of the Personal Property Law was repealed effective Sept. 27, 1964, N.Y.Gen. Oblig. Law § 19–103 (McKinney 1964), by N.Y.Gen.Oblig. Law § 19–101 (McKinney 1964). It was replaced by N.Y.Gen. Oblig. Law § 5–701 (McKinney 1964), which provides in pertinent part:

Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

10. Is a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein including a majority of the voting stock interest in a corporation and including the creating of a partnership interest. *"Negotiating" includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. This provision shall apply to a contract implied in fact or in law to pay reasonable compensation* but shall not apply to a contract to pay compensation to an auctioneer, an attorney at law, or a duly licensed real estate broker or real estate salesman. (emphasis added).

A comparsion of the statute quoted in the text with the one set out above indicates that they are substantially similar. Additions to the former statute are italicized in the amended statute above. In Minichiello v. Royal Business Funds Corp., 18 N.Y.2d 521, 277 N.Y.S.2d 268, 223 N.E.2d 793 (1966), cert. denied, 389 U.S. 820, 88 S.Ct. 41, 19 L.Ed.2d 72 (1967), the Court of Appeals of New York, in an opinion by Judge Keating, held that, "In 1964, the Legislature amended subdivision 10 to clearly apply the section to finders and to preclude any recovery in *quantum meruit.*" *Id.* at 525, 277 N.Y.S.2d at 270, 223 N.E.2d at 795. It should be noted, however, that *Minichiello* also concluded that the former statute "intended to include finders within the operation of subdivision 10 of section 31 and to preclude any recovery in *quantum meruit.*" *Id.* at 527, 277 N.Y.S.2d at 272, 223 N.E.2d at 796.

**71.** *See* note 70 *supra.*

consisting of initiating, influencing, arranging, and facilitating defendant's acquisition of the Potentiometer Division of DeJur Amsco Corporation, which work, labor and services were reasonably worth one-half of the value of the Potentiometer Division of De-Jur Amsco Corporation, or, $25,000.00 at plaintiff's option, which consideration the defendant promised to pay the plaintiff for his work, labor and services.

It seems clear that this cause of action is not bottomed on the alleged agreement of joint venture. The claim is, in essence, one for a fee or commission for plaintiff's alleged services in "initiating, influencing, arranging and facilitating defendant's acquisition of the Potentiometer Division of De-Jur Amsco Corporation." No writing has ever been produced reflecting the assertions set forth in plaintiff's second cause of action. Accordingly, plaintiff's claim is barred by the statute of frauds as embodied in N.Y.Pers.Prop.Law § 31 (McKinney 1962), as amended, N.Y. Gen.Oblig.Law § 5–701 (McKinney 1964), and the decisions interpreting this statute.[72]

## V. ISSUE OF LIABILITY

The issue, which this court must evaluate, is whether plaintiff has sustained his burden of demonstrating, by a preponderance of the credible evidence, that an oral joint venture agreement—to acquire and thereafter operate the assets of the Potentiometer Division of the DeJur-Amsco Corporation—was entered into by the parties. If plaintiff sustains his burden on this threshold issue, then the court must determine whether the agreement was breached.

Before turning to the testimony adduced at trial, it would be helpful to set out the essential elements required for the creation of a joint venture contract.

■■■■ A recent New York case described a joint venture as "a special combination of persons or other entities to carry on some specific enterprise for a profit." Masterson v. Valley National Bank, 70 Misc.2d 623, 625, 334 N.Y.S.2d 356, 359 (Sup.Ct. Nassau County 1972). But as this court has said "it [joint venture] is at best a nebulous concept whose boundaries are not precisely drawn. Defining a joint venture is easier than identifying it, for each case depends upon its own facts." Backus Plywood Corp. v. Commercial Decal, Inc., 208 F.Supp. 687, 690 (S.D.N.Y.1962), modified, 317 F.2d 339 (2d Cir.), cert. denied, 375 U.S. 879, 84 S.Ct. 146, 11 L. Ed.2d 110 (1963). In the *Backus Plywood* case, this court set out a lengthy quotation from the opinion of Judge Murphy in United States v. Standard Oil Co., 155 F.Supp. 121 (S.D.N.Y.1957), aff'd, 270 F.2d 50 (2d Cir. 1959). This quotation, I believe, distills the essence of the law of joint adventures. After concluding that a "[p]recise definition of a joint venture is difficult," 155 F. Supp. at 148, Judge Murphy stated:

Joint ownership by itself is not sufficient to create a joint venture, Bowmaster v. Carroll, 8 Cir., 1928, 23 F.2d 825, nor is a mere community of interest, Hasday v. Barocas, 1952, 10 Misc.2d 22, 115 N.Y.S.2d 209. Many factors are taken into consideration by the courts in determining whether

72. *See* cases cited note 68 *supra. But cf.* Walzer v. Rettner, 11 A.D.2d 10, 201 N.Y.S.2d 377 (1st Dept. 1960).

Plaintiff arguably asserted a claim in *quantum meruit* when he alleged that his "services were reasonably worth one-half the value of the Potentiometer Division. . . ." Although some courts construed N.Y.Pers.Prop.Law § 31 (McKinney 1962) to permit recovery by a broker or finder in *quantum meruit* when there was no written agreement, *see, e. g.,* Wells v. Dent, 4 A.D.2d 307, 164 N.Y.S.2d 646 (4th Dept. 1957) ; Gibson v. Archer Prods., 281 App.Div. 661, 117 N.Y.S.2d 438 (1st Dept. 1952), the New York Court of Appeals held that the statute was intended to preclude recovery on a *quantum meruit* theory. Minichiello v. Royal Business Funds Corp., 18 N.Y.S.2d 521, 277 N.Y.S.2d 268, 223 N.E.2d 793 (1966), cert. denied, 389 U.S. 820, 88 S.Ct. 41, 19 L.Ed.2d 72 (1967). *See* note 70 *supra.*

the relationship exists. To begin with, it is a voluntary relationship, the origin of which is wholly *ex contractu*, i. e., it is not a status created by law. An agreement between the parties to create a joint venture is essential and whether or not a joint venture exists depends entirely upon the intention of the parties, either express or implied. As a general rule joint ventures are thought of in relation to a specific venture, a single undertaking, although the undertaking need not be one susceptible of immediate accomplishment. It is in the nature of a partnership limited to a particular venture, not general in operation or duration. It has been variously defined as an association to carry out a single business enterprise for profit; a common enterprise for mutual benefit; a combination of property, efforts, skill and judgment in a common undertaking. Joint control and management of the property and authority to act each for the other are usual characteristics along with the incurring of joint obligations and the enjoyment of joint rights. An agreement to share joint profits is essential to the creation of a joint venture. The profit accruing must be joint and not several; each must have an equitable interest in the profits themselves. But such an agreement in and of itself is not determinative. The joint sharing of losses is also commonly regarded as essential. [citations omitted]. 155 F.Supp. at 148.[73]

Having set forth in general the essential elements of a joint venture relationship, it is necessary to take a closer look at these elements under the substantive law of New York. The first and most important element is, of course, the existence of a contract.[74] 32 N.Y.Jur. Joint Adventures § 7 (1963). In one case a court stated that an oral contract among three persons to purchase real property as owners in common was not sufficient to establish a joint venture. The court concluded that there must be a specific agreement that the individuals are engaging in a joint enterprise before a joint venture can be established. Rizika v. Kowalsky, 207 Misc. 254, 138 N.Y.S. 2d 711 (Sup.Ct. Oneida County 1954), aff'd, 285 App.Div. 1009, 139 N.Y.S.2d 299 (4th Dept.), reargument and appeal denied, 285 App.Div. 1116, 141 N.Y.S.2d 515 (4th Dept. 1955). Hence, the agreement must manifest the intent of the parties to be associated as joint venturers. Shove v. Siegbert, 239 App.Div. 334, 267 N.Y.S. 306 (1st Dept. 1933); Hutchinson v. Birdsong, 211 App.Div. 316, 207 N.Y.S. 273 (1st Dept. 1925); Levine v. Personnel Institute, Inc., 138 N.Y.S.2d 243 (Sup.Ct.N.Y.County 1954), aff'd, 2 A.D.2d 964, 158 N.Y.S.2d 740 (1st Dept. 1956).

██ It is well settled under New York law that each of the coadventurers must make some contribution to the joint undertaking. There must be some combination of property, financial resources, effort, skill or knowledge. *See, e. g.*, Wagner v. Derecktor, 306 N.Y. 386, 390, 118 N.E.2d 570, 572 (1954); Mitler v. Friedberg, 32 Misc.2d 78, 222 N.Y.S.2d 480 (Sup.Ct.N.Y.County 1961). Additionally, the parties to an agreement of joint adventure must have some degree of joint proprietorship and control over the enterprise. Wagner v. Derecktor, 306 N.Y. 386, 390, 118 N.E.2d 570, 572 (1954); Levine v. Personnel Institute, Inc., 138 N.Y.S.2d 243 (Sup. Ct.N.Y.County 1954), aff'd, 2 A.D.2d 964, 158 N.Y.S.2d 740 (1st Dept. 1956); LaDreire v. Martin, 56 N.Y.S.2d 436 (Sup.Ct.N.Y.County 1945); Taubman, What Constitutes a Joint Venture, 41 Cornell L. Q. 640, 644 (1956); Nichols,

---

73. This summary was chosen by a noted authority to conclude his discussion of the essential elements of joint adventure contracts. 2 S. Williston, § 318A at 579.

74. Judge John Minor Wisdom has aptly stated that, "The sine qua non of joint venture is a contract purposefully entered into by the parties." Hyman v. Regenstein, 258 F.2d 502, 512 (5th Cir. 1958), cert. denied, 359 U.S. 913, 79 S.Ct. 589, 3 L.Ed.2d 575 (1959).

Joint Ventures, 36 Va.L.Rev. 425, 439 (1950).

 Finally, to establish a joint venture there must be a provision for the sharing of profits [75] and losses.[76] Steinbeck v. Gerosa, 4 N.Y.2d 302, 175 N.Y.S.2d 1, 151 N.E.2d 170 (1958); Wagner v. Derecktor, 306 N.Y. 386, 390, 118 N.E.2d 570, 572 (1954); George W. Haxton & Son, Inc. v. Rich, 267 App. Div. 492, 47 N.Y.S.2d 501 (3d Dept. 1944); Columbian Laundry v. Hencken, 203 App.Div. 140, 196 N.Y.S. 523 (1st Dept. 1922); DeBella v. Gulotta, 232 N. Y.S.2d 144 (Sup.Ct. Suffolk County 1962); Mitler v. Friedberg, 32 Misc.2d 78, 222 N.Y.S.2d 480 (Sup.Ct.N.Y. County 1961); Lester v. Rubinstein, 156 N.Y.S.2d 518 (Sup.Ct.N.Y.County 1956), modified, 3 A.D.2d 902, 162 N.Y. S.2d 707 (1st Dept. 1957); Marathon Motors, Inc. v. Atlas Buick Co., 150 N. Y.S.2d 289 (Sup.Ct. Kings County 1956); cf. Century Federal Savings & Loan Association v. Sullivan, 116 N.Y. S.2d 323 (Sup.Ct. Westchester County 1952), modified, 281 App.Div. 830, 118 N.Y.S.2d 479 (2d Dept. 1953). Absent an express provision, some courts have implied the sharing of losses in the same proportion as profits are shared. 32 N. Y.Jur. Joint Adventures, § 11, at 285 & n. 14 (1963).[77]

With this background we can undertake an evaluation of the instant controversy with a view toward determining whether the elements essential to the formation of a joint venture agreement are present. In this regard it would be helpful briefly to outline the contentions of the parties.

Plaintiff contends that he and defendant entered into a joint adventure in April, 1963. The immediate objective of the undertaking was the acquisition of the DeJur Potentiometer Division. Plaintiff's contribution to the venture was his ability—due to his alleged close relationship with the DeJur management —to influence the sale of the Potentiometer Division. Defendant, it is asserted, was to supply the financing for the acquisition. If the Potentiometer Division were acquired by the parties, they were to operate the venture through a corporation, which was to be formed under Connecticut law. As stated earlier, plaintiff contends that defendant's eventual procurement of the Potentiometer Division resulted from plaintiff's efforts on behalf of the asserted joint enterprise. Thereafter, plaintiff claims that he was completely excluded from partici-

---

75. See 2 S. Williston, § 318A, at 564 & nn. 9 & 10.

76. There are some New York cases that apparently do not deem the sharing of losses essential to a joint venture relationship. See, e. g., Montenegro v. Roxas, 141 N.Y.S.2d 681 (Sup.Ct.N.Y.County 1955); Usdan v. Rosenblatt, 93 N.Y.S. 2d 862 (Sup.Ct.N.Y.County 1949), citing Mariani v. Summers, 3 Misc.2d 534, 52 N.Y.S.2d 750 (Sup.Ct.N.Y.County 1944), aff'd, 269 App.Div. 840, 56 N.Y.S. 2d 537 (1st Dept. 1945). Both this court, Backus Plywood Corp. v. Commercial Decal, Inc., 208 F.Supp. 687, 691 (S.D. N.Y.1962), modified, 317 F.2d 339 (2d Cir.), cert. denied, 375 U.S. 879, 84 S.Ct. 146, 11 L.Ed.2d 110 (1963), and a law review commentator, Taubman, supra note 60, at 645, have asserted that the Usdan court's reliance on Mariani was misplaced.

77. Additionally, it should be noted that to maintain an action for breach of a joint venture agreement under New York practice, it is necessary specifically to allege that defendant entered into the asserted contract of joint adventure. Jacobson v. Salvage, 4 App.Div.2d 1012, 168 N.Y.S. 2d 293 (1st Dept. 1957). Moreover, it is necessary to plead the terms of the agreement, defendant's breach, and that plaintiff has fully performed all terms and conditions to be performed on his part. DeBella v. Gulotta, 232 N.Y.S.2d 144 (Sup.Ct. Suffolk County 1962). Accord, Billingsley v. Illich, 75 N.Y.S. 2d 913 (Sup.Ct. Westchester County 1946), aff'd, 272 App.Div. 1063, 75 N.Y.S. 2d 517 (2d Dept. 1947). Lastly, in some instances the claimant must state that the defendant denies the existence of the joint venture. Gross v. Gross, 31 Misc.2d 934, 221 N.Y.S.2d 785 (Sup.Ct. Kings County 1961).

pating in the venture, and that defendant has relocated and operated the Potentiometer Division in the State of Connecticut through a corporation called Samarius, Inc.

Defendant denies entering into the agreement asserted by plaintiff. Defendant, however, admits having discussed the acquisition of the Potentiometer Division with plaintiff when plaintiff was confined at Doctors Hospital in New York. He contends, however, that plaintiff voluntarily offered to speak to Ralph DeJur, the President and Treasurer of the DeJur-Amsco Corporation, concerning the availability and price of the Potentiometer Division. Defendant also admits that during his conversations with plaintiff, plaintiff expressed a desire to "get into the act." [78] But he contends that no definite agreement or arrangement concerning plaintiff's participation, if any, in the venture was ever reached.

Defendant further asserts that whatever efforts plaintiff may have made, no agreement was reached with DeJur in the Spring of 1963. Indeed, he contends that DeJur increased its original price demand for the Potentiometer Division, and, at one point, insisted that the Potentiometer Division could only be obtained as part of a "package deal" with the Transducer [79] Division, which DeJur also desired to sell. When defendant expressed an interest in the offered "package deal," a conference was held between defendant and DeJur. Defendant contends that at this conference Ralph DeJur attempted to obtain some interest or financial benefit for plaintiff from the proposed transaction between defendant and DeJur. This effort by Ralph DeJur caused defendant to terminate the negotiations with DeJur. This conference occurred on May 23, 1963. Defendant alleges that between that time and his

eventual acquisition on September 30, 1963, he never had any discussions with plaintiff concerning the Potentiometer Division. Moreover, he claims that Sam Rosenberg, a DeJur employee, called him in September, and informed him that the Potentiometer Division was available on more liberal terms than previously offered. Defendant asserts that his purchase of the Potentiometer Division evolved from this discussion with Sam Rosenberg.

In sum defendant asserts that he never agreed to the partnership or joint venture scheme alleged by plaintiff, and that his acquisition in September did not flow from the efforts of plaintiff in any manner.

Having summarized the contentions of the parties, we can now examine the testimony and evidence adduced at trial. Plaintiff and defendant were first cousins. It was established at trial that the Potentiometer Division of the DeJur-Amsco Corporation was available for purchase in the Spring of 1963. Defendant learned about this from Sam Rosenberg, who was an employee of DeJur and a cousin of both parties to this action. In April, 1963, plaintiff was confined to Doctor's Hospital in New York City, where he was recuperating from a coronary thrombosis. Defendant telephoned plaintiff at Doctor's Hospital and came to visit him a day or two later. Defendant brought plaintiff a gift and loaned him $500, which was later repaid. During his visit at the hospital, defendant told plaintiff that he was interested in acquiring the DeJur Potentiometer Division. Up to this point the parties are in agreement with the facts found by the court.

As to almost everything that subsequently occurred, the parties are in substantial disagreement. The following

78. Defendant's Trial Memorandum at 8.
79. A transducer is
a device actuated by power from one system and supplying power in the same or any other form to a second system (as a telephone receiver actuated by

electric power and supplying acoustic power to the surrounding air or quartz crystals that produce electric power from mechanical power).
Webster's Third New International Dictionary 2426 (1963).

discussions will focus on the testimony bearing on the first, and indispensable, element necessary to establish a joint venture—*i. e.*, an agreement or contract. When defendant (Wernick) brought up the Potentiometer Division, plaintiff (Yonofsky) offered to assist him by speaking to Ralph DeJur, who, as stated earlier, was the President and Treasurer of the DeJur-Amsco Corporation. Plaintiff testified [80] that defendant offered to make him his full partner and put up the entire cash consideration, which defendant understood to be $100,000, if plaintiff would get DeJur to sell him its Potentiometer Division. Yonofsky further testified that defendant agreed that he would be in charge of production at their plant in Connecticut if the sale was consummated. Additionally, plaintiff said that Wernick told him that he could "go fishing" everyday until his health was restored.

In support of his contention that Wernick agreed to enter into a joint venture, Yonofsky offered three other witnesses. The first was Charles Winter, who was Yonofsky's accountant and friend of many years. Winter testified that defendant had visited him at his home and told him about the agreement with Yonofsky. Moreover, he related that defendant had come to him for advice on how to deal with Ralph DeJur. This witness outlined the agreement between the parties as he understood it from his conversations with both Yonofsky and Wernick. He testified that he made notes of his discussion with Wernick. These notes were introduced into evidence. Winter related that these notes were made about five or six weeks after his meeting with defendant "when [he] began to realize that everything might not work out properly."

Defendant disputed substantially all of Winter's testimony. Defendant maintained that he went to see this witness to inquire whether Winter could provide some financial assistance to Yonofsky so

that Yonofsky could buy into defendant's proposed business. The testimony of Winter is thus in direct conflict with that of Wernick. The court is troubled by the notes that Winter stated he made five or six weeks after his discussion with defendant. The notes are undated. Moreover, Winter testified that he turned the notes over to plaintiff's counsel only a short time—approximately two months—before trial. These notes appear to have been made in contemplation of this litigation, and, therefore, considerably undermine the weight to be accorded to Winter's testimony. Additionally, it cannot be overlooked that this witness was plaintiff's friend and accountant for over thirty years.

Plaintiff's next witness was Ralph DeJur. DeJur is the uncle of both plaintiff and defendant. On direct examination he testified that he had visited plaintiff at Doctor's Hospital and that Yonofsky informed him about his arrangement with Wernick. He indicated that he took Yonofsky's statement regarding the proposed partnership with defendant "very lightly," and testified that he told Yonofsky that "If you raise the money then I would see what I can do." DeJur stated that plaintiff and defendant had some meetings at the DeJur-Amsco factory when Yonofsky came out of the hospital.

He then related his version of what took place at a meeting on May 23, 1963. The meeting took place at the offices of DeJur's general counsel. It was scheduled to work out details of the sale of the Potentiometer Division to Wernick. DeJur testified that Yonofsky "got on the phone—he was not at the meeting and he starts screaming and I said to myself, that here is a man who came out of the hospital with a heart attack, I don't want to be a part of it and be a party to it, and I walked out, and that was the end of the transaction." This witness was not very illuminating with respect to this conversation with plain-

---

80. Plaintiff was too ill to testify in person during the trial. Counsel for both sides read portions of plaintiff's testimony that was given at a pretrial deposition.

tiff. Other witnesses—principally Yonofsky, Wernick and Judge Henchel—provided greater details of this conversation.

Yonofsky testified that he wanted to attend the meeting, but that he was dissuaded from doing so by DeJur. Plaintiff related that DeJur said he would look after plaintiff's interest. As to the telephone conversation testified to by DeJur, Yonofsky stated that it was DeJur who had called him, that defendant was with DeJur at the time, and that he (Yonofsky) spoke to defendant. He related that Wernick told him that the reason for the break off of the negotiations was that "the DeJur people" were making unreasonable demands concerning mortgages on defendant's old business as well as on the new business.

Wernick's version of the conversation was considerably different. He testified that he told Yonofsky that Ralph DeJur was making outrageous demands concerning Yonofsky's participation in the transaction. Defendant said that DeJur demanded that defendant give Yonofsky half of the business and $25,000. Wernick related that he told Yonofsky that the deal was off, and that he did not owe Yonofsky $25,000. Wernick did say, however, that had he acquired the Potentiometer Division he would have provided a job for plaintiff.

This conversation is a pivotal point in the case. It marked the termination of the arrangement, if any, between plaintiff and defendant. Ralph DeJur testified, however, that Yonofsky came to see him after the May 23, 1963 meeting, and told him that he (Yonofsky) had "worked it out with Sol Wernick," and requested that DeJur see what he could do to get them the Potentiometer Division. DeJur also testified that he never told Yonofsky to stay away from the meeting. This flatly contradicts Yonofsky's own testimony.

On cross-examination DeJur was asked if he testified at a pretrial deposition and whether he gave answers to certain questions at that time. Plaintiff's counsel conceded that the witness (DeJur) had been asked certain questions and that he gave the answers read by defendant's attorney. The answers given by DeJur at his deposition contradicted his direct testimony on a number of significant points. First, DeJur said Yonofsky told him nothing about his arrangement with Wernick, and secondly, that after May 23, 1963—the date on which the original transaction fell through—he never met with Yonofsky concerning the sale of the Potentiometer Division. The contradiction between his direct and deposition testimony seriously undermines the credibility of this witness. Accordingly, little weight can be accorded to his testimony.

The last witness called by plaintiff was Nathan Geldman. He was a former employee of DeJur-Amsco Corporation and knew both plaintiff and defendant for over thirty-five years. He testified that he had met with both Yonofsky and Wernick on the day that the transaction with DeJur was to be closed. He stated that he had lunch with them at a diner near the DeJur factory, and that they (Yonofsky and Wernick) indicated that it was the price demands of DeJur that caused the transaction to be called off. Geldman, in addition, testified that plaintiff's participation had changed and that plaintiff was supposed to raise some money for the transaction. This witness' memory was poor and his testimony lacked clarity.

Plaintiff's counsel concluded his case by reading from defendant' pretrial deposition. In this testimony defendant denied asking plaintiff to speak to Ralph DeJur on his behalf. He stated that plaintiff requested permission to talk to DeJur, but admitted that he did not discourage plaintiff in this regard. Wernick indicated that he offered to let Yonofsky buy into the business he was proposing to set up if he acquired the Potentiometer Division.

In his direct testimony defendant denied entering into any partnership arrangement with Yonofsky. He said that after he spoke to plaintiff the price of the Potentiometer Division was in-

creased. His testimony, as stated before, contradicted that given by Charles Winter almost point for point.

After the transaction fell through on May 23, 1963, Wernick said he never spoke to Yonofsky until after he acquired the Potentiometer Division in September, 1963. He testified that Yonofsky called him in October, 1963, and told him that Ralph DeJur had let him (Yonofsky) down. In general, this witness denied each and every allegation made by plaintiff. Defendant's testimony at trial was basically consistent with his pretrial deposition.

These are two points, however, in which defendant seemed incredible. The first concerned the purchase of a couch by plaintiff and defendant. The couch was at a plant in Derby, Connecticut in which Wernick eventually set up his Potentiometer business. Defendant admits that Yonofsky paid one-half of the twenty-five dollar purchase price of the couch, and that the couch was subsequently used at his plant. Wernick tried to explain this incident away by stating that "Mr. Yonofsky is in the antique business, and we bought a lot of things together." This explanation seems farfetched. Plaintiff asserts that this joint purchase lends support to his claim that Wernick agreed to the asserted joint venture. Although the purchase of this couch is troubling, it is a slim thread on which to predicate the alleged joint adventure. Even if the joint purchase of the couch in some measure supports Yonofsky's contentions, it holds little weight when balanced alongside the totality of evidence adduced at trial.

The second point in which defendant seemed incredible concerned his use of the word "We" during his discussion with Yonofsky at Doctor's Hospital. Relating the substance of this discussion, Wernick stated *"We* were going to ask a figure . . . " and *"We* didn't want to volunteer a figure." These statements concerned the strategy that plaintiff was to use when he spoke to Ralph DeJur. Defendant explained that the "We" referred to himself and Sa-

marius Electronics Corporation, which was the name of his business at that time. In the context in which the "We" statements were made it is difficult to accept Wernick's explanation. But even if the court accepts the contention of plaintiff that the "We" referred to Yonofsky and Wernick, the court does not attach great significance to this factor.

There was one other witness on defendant's direct case. He was defendant's Connecticut attorney (Judge Henchel); he participated in the two closing conferences between Wernick and DeJur. His testimony centered on the telephone conversation between Yonofsky and Wernick on May 23, 1963. He supported defendant's version of what caused the break-off of negotiations between defendant and DeJur.

Defendant wound up his case by reading from plaintiff's deposition. The major point adduced was that plaintiff attempted to get other purchasers for the Potentiometer Division after May 23, 1963.

■ Viewed in the light most favorable to plaintiff, the testimony reveals that Yonofsky was promised something by defendant if he aided defendant's acquisition of the DeJur Potentiometer Division. But that something was never clearly revealed; it certainly was not a fifty-percent interest in defendant's business. Perhaps it was a promise of employment, but even this was never definitely worked out between the parties. Whatever arrangement may have existed between the parties was at best vague and indefinite. The court concludes that plaintiff has failed to carry his burden to establish, by a preponderance of the credible evidence, that defendant agreed to enter into the asserted joint venture. With this conclusion it is unnecessary to analyze the other elements essential to establishing a joint venture agreement.

Nevertheless, the court deems it appropriate to comment on some of these other elements. Plaintiff asserted that his close relationship with Ralph DeJur

enabled defendant to eventually acquire the Potentiometer Division. The testimony reveals, however, that Ralph DeJur took plaintiff's arrangement with Wernick "very lightly." Moreover, plaintiff admitted that the price of the acquisition increased after he spoke to DeJur. Consequently, it is doubtful whether Yonofsky had the ability to influence the transaction as alleged in his complaint. Accordingly, it is not clear what contribution plaintiff brought to the alleged joint adventure.

Additionally, Yonofsky's financial position was at best dubious. Thus it is difficult to imagine how plaintiff could have shared the burden of losses if the asserted joint venture was unsuccessful. The sharing of losses by coadventurers is an essential element of a joint venture relationship.

Lastly, plaintiff's own testimony revealed that he competed against the asserted joint venture by attempting to obtain other purchasers for the DeJur Potentiometer Division. Parties to an agreement of joint adventure owe each other the highest duty of care and good faith. *See, e. g.,* Endries v. Paddock, 241 App.Div. 195, 271 N.Y.S. 848 (1st Dept. 1934), aff'd 276 N.Y. 526, 196 N. E. 562 (1935).[81] Accordingly, the relationship is considered fiduciary in nature,[82] and coadventurers must obey the standard of conduct so eloquently articulated by Justice (then Chief Judge) Cardozo when he stated "Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." Meinhard v. Salmon, 249 N. Y. 458, 464, 164 N.E. 545, 546 (1928). It appears that plaintiff violated this obligation to the fiduciary relationship he asserts.

Plaintiff would have the court ignore his attempted sales of the Potentiometer Division, on the ground that they took place during a period when the alleged joint venture was in a state of dormancy. Alternatively, he argues that there were two joint ventures. One before the May 23, 1963 meeting, and one that evolved sometime between May 23, 1963 and September 30, 1963, when Wernick acquired the Potentiometer assets. The only testimony indicating that plaintiff renewed his efforts on behalf of the alleged joint venture came from Ralph DeJur. This testimony contradicted his earlier testimony given at a pretrial deposition. The court finds that plaintiff has failed to establish the existence of a second joint venture agreement. Accordingly, judgment is granted to defendant. This opinion shall constitute the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

So ordered.

---

81. *See generally* cases cited note 83 *supra.*

82. *See* Hammond Oil Co. v. Standard Oil Co., 259 N.Y. 312, 181 N.E. 583 (1932); Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545 (1928); Selwyn & Co. v. Waller, 212 N.Y. 507, 106 N.E. 321 (1914); King v. Barnes, 109 N.Y. 267, 285, 16 N.E. 332, 336 (1888); R. C. Gluck & Co. v. Tankel, 12 A.D.2d 339, 211 N.Y.S.2d 602 (1st Dept. 1961), aff'g, 24 Misc.2d 841, 199 N.Y.S.2d 12 (Sup.Ct. N.Y. County 1961); Endries v. Paddock, 241 App.Div. 195, 271 N.Y.S. 848 (1st Dept. 1934), aff'd, 267 N.Y. 526, 196 N.E. 562 (1935); New Yorkers Producing Corp. v. Moss, 237 App.Div. 567, 262 N.Y.S. 113 (1st Dept. 1933); Madison Pictures, Inc. v. Pictorial Films, Inc., 6 Misc.2d 302, 151 N.Y.S.2d 95 (Sup.Ct.N.Y.County 1956); In re Kohn's Estate, 26 Misc.2d 659, 116 N.Y.S. 2d 167 (Sup.Ct.N.Y.County 1952), aff'd, 282 App.Div. 1045, 126 N.Y.S.2d 897 (1st Dept. 1953); Mariani v. Summers, 3 Misc.2d 534, 52 N.Y.S.2d 750 (Sup.Ct.N.Y.County 1944), aff'd, 269 App.Div. 840, 56 N.Y.S.2d 537 (1st Dept. 1945); Conway, note 49, *supra.*